**In re ADANA MORTGAGE BANKERS, INC., Debtor.**

**Bankruptcy No. 80–00324A.**

United States Bankruptcy Court,
N. D. Georgia,
Atlanta Division.

Aug. 14, 1980.

---

See, also, Bkrtcy., 12 B.R. 1012.

David Epstein, Kenneth Oestreicher, Attys., Civ. Div., Dept. of Justice, Washington, D. C., for plaintiff.

Carr, Abney, Tabb & Schultz, Benjamin C. Abney, Atlanta, Ga., for defendant.

OPINION

WILLIAM L. NORTON, Jr., Bankruptcy Judge.

This motion for a finding of contempt was brought by the Debtor against the Government National Mortgage Association ("GNMA") and certain of its officers and agents for actions which the Debtor contends violated the automatic stay provisions of the Bankruptcy Code, to wit: Section 362(a)(3), which prohibits acts "to obtain possession of property of the estate or of property from the estate." The three items of property which are the center of the controversy are: (1) certain custodial bank accounts established and maintained by the Debtor, (2) certain mortgages held by the Debtor which back GNMA securities issued by the Debtor, and (3) a contractual agreement between GNMA and the Debtor, granting the Debtor the right to hold and service these mortgages. In particular, the Debtor (sometimes referred to as "Adana") submits that delivery, on February 6, 1980, of a letter terminating the Debtor's issuer status under the contracts between the Debtor and Adana, and the subsequent attempt, on March 3, 1980, to seize, by letter and oral demand to the banks, all of the Debtor's GNMA custodial bank accounts and pooled loan documents, are actions justifying contempt citations from this Court.

FINDINGS OF FACT

Debtor is a mortgage banker primarily engaged in originating or purchasing mortgage loans which it then forms into "pools" of approximately one million dollars in value. Pursuant to agreements (sometimes referred to as the "Guaranty Agreements," as the "servicing agreements" or as the "Agreements") between Debtor and GNMA, these mortgage pools then become the basis for the issuance of mortgage-backed securities issued by the Debtor and guaranteed by GNMA pursuant to authority granted by Section 306(g) of the National Housing Act, codified at 12 U.S.C. Section 1721(g). A separate Guaranty Agreement is executed between Adana and GNMA with respect to each "pool" of mortgages. The securities (sometimes referred to as "Certificates") issued for each pool of mortgages are then sold by Adana to investors in the marketplace, who receive a monthly return from the issuer equivalent in amount to the principal received on the mortgages in the pool, plus a specified rate of interest set forth on the securities. The

issuer, Adana, then functions as servicer of the mortgages and securities; it uses the money it receives from the individual mortgagors in each pool to pay the monthly payments to its certificate holders. In the event of a shortfall in receipts from the underlying mortgages, the issuer is, nevertheless, responsible for paying the full amount due to the security holders promptly by the fifteenth day of each month. Although the issuer will recover any payment of its own funds if it eventually recovers the delinquent payments from the underlying mortgagors, there is no assurance that such funds paid out by the issuer will be recovered. The issuer also collects tax and insurance escrows from the individual mortgagors and pays the taxes and insurance on the mortgaged properties as they become due. For all of these services the issuer collects a servicing fee based upon a percentage of the payments received from the mortgagors.

GNMA is a corporation, wholly owned by the United States government,[1] under the control and management of the Secretary of HUD.[2] GNMA was created in 1968 to take over certain of the secondary mortgage market operations of the Federal National Mortgage Association ("FNMA") and to carry on the mortgage-backed securities program.[3] All of the benefits and burdens incident to the administration of GNMA inure to the Secretary of the Treasury, after expenses and reserves.[4]

One of the numerous documents required to be submitted by the Debtor to GNMA prior to the issuance of GNMA certificates is a Guaranty Agreement, which is the primary document setting forth the relationship between the Debtor, as issuer of the GNMA certificates, and GNMA, as the guarantor of the certificates. The Guaranty Agreement provides that GNMA will pay the amounts due on the certificates, should the issuer fail to do so. Pursuant to the Guaranty Agreement GNMA (a) takes unrecorded assignments of the mortgages, (b) requires the establishment of custodial bank accounts for the receipts of principal, interest, and escrow funds from the individual mortgagors, (c) requires all the mortgage loan documents to be held by an independent custodian, and (d) charges a guaranty fee based upon a percentage of the servicing fee collected by the servicer.

The Guaranty Agreement provides that two specified events are automatic events of default by the issuer: (1) failure to make monthly payments on the certificates as they become due and (2) the application by the issuer for an advance from GNMA to pay the certificate holders. The Guaranty Agreement also sets forth numerous other obligations of the issuer which, may, upon written notice from GNMA to the issuer, be declared events of default. Among this latter category of optional defaults are the following: (1) failure to give advance notice of bankruptcy, (2) failure to maintain a specified minimum net worth established by GNMA, and (3) the actual filing of a petition in bankruptcy. Upon the occurrence of a default under the Guaranty Agreement, whether automatic or elective, GNMA is contractually entitled to issue a letter of extinguishment to the issuer. The effect of this letter is to terminate thereafter any rights that the issuer has retained in the pooled mortgages and to substitute GNMA for the debtor as the issuer of the certificates. Upon this occurrence, GNMA, as substituted issuer, is entitled to collect the receipts under the mortgages and becomes responsible for all future payments on the certificates.

The issuer's right to service the mortgages in the Debtor's GNMA pools and to col-

---

1. 31 U.S.C. § 846.

2. 12 U.S.C. §§ 1723(a) and 1723a(d).

3. 11 U.S.C. § 362(j), *See generally* H.Rep.No. 1585, 90th Cong.2d Sess. (1968).

4. 12 U.S.C. § 1722.

lect the servicing fees allowed under the Guaranty Agreements is a valuable right, which can be sold to another servicer (approved by GNMA) for a substantial amount. The Debtor has stated in its Statement of Financial Affairs that its servicing portfolio has a value of $700,000.00. There is testimony that the value of the portfolio might actually approach $1,000,000.00.

The Debtor filed its voluntary petition under Chapter 11 of the new Bankruptcy Code on Friday, February 1, 1980. On Monday, February 4, 1980 the Debtor notified GNMA of the filing by a telephone call to GNMA's offices in Washington, D.C. On February 6, 1980 the Debtor's president, Ramsey Agan, and the Debtor's attorney, Benjamin C. Abney, flew to Washington, D.C. to meet with GNMA. At that meeting GNMA made the determination that the Debtor was in default under the Guaranty Agreements with GNMA. GNMA's determination was based on a perceived change of business status of the Debtor that materially affected GNMA, the acknowledgment and confirmation of the Debtor's insolvency, the inability of the Debtor to meet GNMA's net worth requirements to act as issuer of securities under the Guaranty Agreements, and the fact that the Debtor had failed to give GNMA advance notice of an impending or actual default as required by section 5.03 of the Guaranty Agreements. Accordingly, at the end of the meeting on February 6, 1980, Mr. R. Frederick Taylor, Executive Vice-President of GNMA, delivered a letter, which GNMA contends terminated all of the Debtor's rights as issuer under the Guaranty Agreements, declaring Adana in default and advising the Debtor that GNMA was exercising its contractual rights to substitute itself for the Debtor as issuer under the Guaranty Agreements. GNMA then offered a substitute contract to the Debtor which among other things, (1) reduced the compensation the Debtor would receive for its servicing of the mortgages, (2) gave GNMA the right to terminate the substitute contract at any time without compensation to the Debtor's estate, (3) transferred control of all of the custodial bank accounts from the Debtor to GNMA, and (4) limited the term of the contract to one (1) year. The Debtor has never executed the proposed interim servicing agreement presented to it by GNMA.

In the early morning of March 3, 1980, GNMA sent one of its officers to each of the three line banks and, without any prior warning to the Debtor or the line banks or approval by the Bankruptcy Court, presented a written demand that the line banks turn over all funds in the Debtor's custodial accounts and all mortgages and other loan documents pertaining to GNMA pools and held by the line banks as custodians. Each custodial bank refused to comply with GNMA's demand without first obtaining direction from this Court.

The Debtor promptly filed a motion for contempt the same day alleging that the letter of February 6, 1980, attempting to terminate the Debtor's issuer status under the Guaranty Agreements, and the attempted seizure of the custodial bank accounts and mortgage documents violated the stay. At 10:50 A.M., that morning the hearing on that motion began before this Court, with attorneys representing the Debtor, GNMA and the three line banks present. After hearing, the court entered an order to preserve the status quo until a full hearing could be held on March 11, 1980.

R. Frederick Taylor signed the February 6, 1980 default letter that allegedly terminated GNMA's contract with the Debtor on the basis of the Debtor's financial condition. Mr. Taylor also ordered the March 3, 1980 demand letters to the three line banks to be delivered. William Linane, Warren Lasco, and Clement Dinsmore delivered the March 3, 1980 demand letters to the three line banks that held the Debtor's custodial accounts. Mr. Laurent is the GNMA officer who signed the March 3, 1980 demand letters.

It is undisputed that Adana has made all required payments to the certificate holders

as and when due, and that the defaults cited in the purported letter of termination by GNMA were of the elective nature, i. e., GNMA was required to declare in writing the occurrences as events of default. GNMA officials stated that GNMA's actions were necessary in light of the uncertain financial situation of the Debtor and the absolute necessity of timely payments to the certificate holders. The purpose of the mortgage-backed securities program is to assure a flow of private investment capital into the housing market. Through its experience with the GNMA "straight pass-through" securities program, formerly the only GNMA securities program, GNMA knows that timely, dependable monthly payments are vitally important to investors. According to GNMA, the straight pass-through certificates, which provide for payments to certificate holders only to the extent of receipts on the underlying mortgages, were a failure in the marketplace. On the other hand, the program of "modified pass-through" certificates of the type issued by the Debtor has been highly successful with investors. For this reason, GNMA officials feel that absolute timeliness of payments on these "modified" GNMA certificates is essential to the continued viability of its program, and indirectly to the housing industry of this nation. GNMA officials felt that the Debtor's failure to meet GNMA's net worth requirements threatened the Debtor's ability to make timely payments on its certificates and, consequently, elected to declare the Debtor in default under its Guaranty Agreements and to terminate its Issuer status under the Agreements, notwithstanding the filing of the Debtor's bankruptcy petition. GNMA officials also felt that the demands made upon the line banks were necessary corollaries to the termination of the Debtor's Issuer status.

## SUMMARY OF THE MORTGAGE–BACKED SECURITIES PROGRAM

The following chronological summary of the mortgage-backed securities program is necessary to the discussion of the issues involved in this case:

1. After an investigation of information about Adana's operations submitted to GNMA by Adana, GNMA grants the issuer authority to Adana.

2. Pursuant to the form Guaranty Agreement, GNMA issues a commitment to Adana for guaranty of securities, and assigns a pool number to Adana.

3. Adana makes loans to homeowners and receives mortgages, which are recorded in the name of Adana as Lender. Adana assembles numerous mortgages into a pool, pursuant to the commitment.

4. Adana makes arrangements with a securities dealer to market the mortgage-backed securities when they become available or may market the securities on its own behalf.

5. Adana makes arrangements for a custodian; e. g., a bank; to maintain possession of the mortgages and other documents; and for the holding of principal and interest and tax and insurance funds at such financial institution in a custodial account. Preliminary documentation is sent to GNMA by Adana and the custodian, including a schedule of mortgages certified by the custodian, custodial agreements for the mortgages and the escrow accounts and a schedule of subscribers, on which Adana sets forth the name of the purchaser(s) of the certificate(s) and the irrevocable instructions for delivery of the certificate(s).

6. When a pool is assembled, Adana submits the final documents to GNMA for final and prompt (within 2 calendar days) approval of the issuance.

7. Upon approval, GNMA instructs its transfer agent to prepare and deliver the certificates in accordance with instructions of the issuer.

8. Adana completes the sale of the certificates to the investors who become the "holders" of the certificates (securities).

9. Adana holds record title to the mortgages in the pool in its name.

10. The Guaranty Agreement between Adana and GNMA includes an assignment of the mortgages to GNMA by Adana.

11. The assignments of the mortgages are not recorded.

12. Under the Guaranty Agreement, Adana is responsible for servicing the mortgages, collecting the mortgage payments from the homeowners in that pool and passing on the payments monthly, by the 15th of the month, to the holders, as provided for in the certificates (securities).

13. Under said Agreement, Adana receives a servicing fee based upon a percentage of the unpaid principal balance of the mortgages in the pool.

14. Adana is required to make periodic reports to GNMA.

15. Adana, and its custodial bank, hold the monthly mortgage collections for prompt payment to the securities holders.

16. If a homeowner fails to pay promptly, or defaults altogether, under the Guaranty Agreement, Adana, nevertheless, is responsible to remit promptly the total amount due to the securities holders.

17. In the event of a failure of Adana to pay the securities holders timely, on the 15th of the month, GNMA is forthwith liable to pay, as guarantor, the amount due the securities holders. By statute the GNMA guaranty is backed by the full faith and credit of the United States.

18. Any failure of Adana to pay the securities holders fully and promptly on the 15th of the month is a cause of default in the issuer's Guaranty Agreement with GNMA.

## QUESTIONS PRESENTED

This contempt proceeding presents three basic questions. *First*, whether the delivery by GNMA on February 6, 1980, after filing of the Debtor's Chapter 11 petition on February 1, 1980, of a letter declaring a default and terminating the Debtor's status as issuer under all of the Guaranty Agreements between the Debtor and GNMA violated the automatic stay of 11 U.S.C. Section 362. *Second*, whether the March 3, 1980 letters and demands by GNMA for payment of funds and transfer of documents from custodial accounts at the three banks constituted a violation of the automatic stay. *Third*, if either or both actions violated the stay, whether the circumstances of such violations warrant imposition of the sanction of contempt.

## SUMMARY OF THE ARGUMENTS

The Debtor's motion for contempt seeks sanctions for acts in violation of the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. Section 362, to wit: Section 362(a)(3) which prohibits acts "to obtain possession of property of the estate or of property from the estate." The three items of property cited are (1) contractual rights to service mortgages and collect fees, pursuant to the Guaranty Agreements, (2) the custodial bank accounts, and (3) certain mortgages in the face amount of approximately seventy million dollars.

With respect to its letter of termination of the Debtor's contract rights, GNMA contends (1) that it was permitted to do so by its enabling statute, (2) that its federal regulations requiring minimum net worth for issuers supersede the Bankruptcy Code, and (3) that the servicing contract was not "property" within the scope of Section 541 GNMA also argues that the mortgages and bank accounts did not constitute property of or from the Debtor's estate and hence actions to seize these items could not violate the automatic stay. Finally, GNMA argues that, even if its actions were subject to the automatic stay, no contempt sanctions are appropriate since, (1) GNMA acted under color of right which must deprive its actions of being "knowing and willful;" (2) the debtor has suffered no injury, (3) GNMA was subject to conflicting responsibilities, and (4) no purpose would be served by punishing GNMA and its officials for good faith actions to execute their statutory re-

sponsibilities or for a violation that, at most, was technical.

GNMA attorneys have informed the Court that GNMA has not been involved in any prior bankruptcy cases involving its issuers and that no decisions have been rendered concerning the respective rights of GNMA, its issuers and the securities holders under the GNMA program.[5] Thus, some of the issues presented here seem to be of first impression.

## CONCLUSIONS OF LAW

### SCOPE OF THE AUTOMATIC STAY

One of the fundamental protections offered a debtor in a case under the Bankruptcy Code is the automatic stay of actions against him provided in Section 362 of the Code.[6] The stay operates to prevent a rate of diligence by creditors intent on a piecemeal dismemberment of the Debtor's assets.[7] The stay insures that all of the property of the Debtor will be brought into the custody of the "bankruptcy court by the filing of the petition, and no interference with that custody can be countenanced without the court's permission."[8] Without such a provision the orderly liquidation or rehabilitation of the Debtor would be impossible.[9]

Section 362 provides that a petition operates as a stay, applicable to all entities, of—

"(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor."

As noted above, the stay applies to all "entities." An "entity" includes a "governmental unit"[10] which is defined as the "United States: ... department, agency, or instrumentality of the United States...."[11] Apparent also, is the intention of Congress that the inclusion of the United States in the definition of "entity"

5. *But see* discussion, *infra*, at footnotes 26–30.

6. H.Rep.No. 95–595, 95th Cong., 1st Sess. (1977) at 340; S.Rep.No. 95–989, 95th Cong., 2d Sess. (1978) at 49, U.S. Code Cong. & Admin. News 1978, p. 5787.

7. *Id.*

8. Kennedy, *Automatic Stays Under the New Bankruptcy Law*, 12 U. of Mich. J.L. Reform 1, 3 (1978); reprinted in 1980 Annual Survey of Bankruptcy Law; hereinafter cited as Automatic Stay II.

9. H.R.Rep.No. 95–989 at 340; Sen.Rep.No. 95–989 at 49.

10. 11 U.S.C. § 101(14); See Kennedy, *supra* at 11.

11. 11 U.S.C. § 101(21).

is "intended to be an express waiver of the sovereign immunity of the Federal government, . . . " [12] This waiver is also supported by the language of Section 106(c) of the Bankruptcy Code that any provision referring to a "creditor," "entity" *or* "governmental unit" applies to governmental units, and that "a determination by the court of an issue arising under such a provision binds governmental units." Therefore, upon the filing of a petition in bankruptcy, the stay is meant to be effective against the United States or any of its agencies or instrumentalities, including GNMA, unless an exception can be found in Section 362(b) or elsewhere.

Congress considered the needs of the United States and its agencies in drafting the exceptions to the automatic stay, but provided no exception applicable to the actions taken by GNMA. Sections 362(b)(4) and (5) provide that a governmental unit may enforce its police and regulatory powers, notwithstanding the automatic stay, except enforcement of a money judgment. The legislative history indicates that the police power exception was enacted "to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, . . . " [13] The pursuit by the government of any other objectives not embraced by "police or regulatory power" would not be permitted under the stay.[14]

The limited scope of the Section 362(b)(4) and (5) exceptions is underscored by the following statement by the managers of the Bankruptcy Reform Act of 1978:

> "[t]his section is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." [15]

It is clear that GNMA does not fit under the police power exception to the stay by any reading of the statute or the legislation history, since the public health or safety is not involved here.

■ Another section excepting government action from the coverage of the stay is Section 362(b)(7) which provides that the Secretary of HUD may commence foreclosure actions on mortgages or deeds of trust which were insured under the National Housing Act and which cover property consisting of five or more living units. This exception is carefully limited to commencing an action, and was apparently left in the Code for tax purposes.[16] An earlier draft of this section in the Senate version of the Bankruptcy Reform Act (S.2266) was much broader and would have permitted the Secretary of HUD to commence and continue a foreclosure action by judicial ac-

---

**12.** H.R.Rep.No. 95–595 at 342; Sen.Rep.No. 95–989 at 52, U.S. Code Cong. & Admin. News 1978, p. 6299. "The Reports could well have cited S U.S.C. §§ 702–703 (1976) as collateral support for their position that Congress has waived sovereign immunity as a defense to actions seeking only injunctive or declaratory relief." Automatic Stay II 28–29 n. 116. See also *Verran v. United States Treasury Dept.*, 4 Bankr. Ct. Dec. 47 (E.D. Mich. 1978).

**13.** H.R.Rep.No. 95–595 at 343, U.S. Code Cong. & Admin. News 1978, p. 6299; This overturns decisions reached by courts which applied the automatic stay to state environmental control laws. See Kennedy, *The Automatic Stay in Bankruptcy*, 11 U. of Mich. J.L.Ref. 177, 207 n. 162 (1978) hereinafter cited as Automatic Stay I; Automatic Stay II at 11, 27 n. 111.

**14.** Automatic Stay II at 28.

**15.** 124 Cong.Rec. H 11,092 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong. Rec. S 17,409 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini).

**16.** . . . an amendment has been made to section 362(b) to permit the Secretary of the Department of Housing and Urban Development to commence an action to foreclose a mortgage or deed of trust. The commencement of such an action is necessary for tax purposes. The section is not intended to permit the continuation of such an action after it is commenced nor is the section to be construed to entitle the Secretary to take possession in lieu of foreclosure." 124 Cong.Rec. H 11866 (daily ed. Oct. 6, 1978) (statement of Rep. Edwards).

tion or by power of sale.[17] Comparison of the earlier version and the final version of the Code illustrates that "the exception granted the Secretary of HUD should be given a restricted interpretation." [18]

■ It is apparent from examining the exceptions to the automatic stay, the scope of the stay, and the limited waiver of sovereign immunity provided in 11 U.S.C. § 106 that Congress did not intend to exempt GNMA from the automatic stay provisions of the Bankruptcy Code. This view is supported by the absence of any reference to GNMA in the Code, despite provisions of the Code specifically referring to HUD foreclosures (§ 362(b)(7)) and the secondary mortgage market (§ 541(d)). It is hardly likely that Congress would have included references to government foreclosure actions and the secondary mortgage market in the Code, omitting from the automatic stay exceptions any reference which could be applicable to the actions taken by GNMA, if Congress had, in fact, intended that the acts taken by GNMA would be excepted from the effect of the stay. *See T.I.M.E. v. United States*, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959). The active participation of GNMA to influence provisions of the Bankruptcy Reform Act of 1978, discussed *infra*, strongly supports the analysis that an absence of exceptions to the automatic stay for actions taken by GNMA denotes a Congressional intent that such actions are subject to the stay.

## ALLEGED EXEMPTION IN SECTION 306(g) OF THE NATIONAL HOUSING ACT

■ GNMA has argued that its enabling statute, Section 306(g) of the National Housing Act, permits GNMA to terminate the Debtor's rights under the Guaranty Agreement and take certain other actions, notwithstanding the automatic stay provisions of the Bankruptcy Code. Section 306(g) does not exempt GNMA from the scrutiny of the Bankruptcy Code and this Court. Section 306(g) provides, in pertinent part,

> Any Federal, State or other law to the contrary notwithstanding, the Association [GNMA] is hereby empowered, in connection with any guaranty under this subsection, whether before or after any default, *to provide by contract* with the issuer for the extinguishment upon default by the issuer, of any redemption, equitable, legal, or other right, title, or interest of the issuer in any mortgage or mortgages constituting the trust or pool against which the guaranteed securities are issued; and with respect to any issue of guaranteed securities, in the event of default and pursuant otherwise to the terms of the contract, the mortgages that constitute such trust or pool shall become the absolute property of the Association subject only to the unsatisfied rights of the holders of the securities based on and backed by such trust or pool.

12 U.S.C. Section 1721(g) [emphasis supplied].

Although Section 306(g) of the NHA may be the "applicable law" for purposes of determining whether the Debtor may assume the Guaranty Agreement under Section 365(c) of the Bankruptcy Code, Section 306(g) of the NHA does not exempt GNMA from the operation of the Bankruptcy Code.

■ GNMA contends that the phrase "Any Federal, State, or other law to the contrary notwithstanding" in Section 306(g) gives it the right to terminate the Debtor's rights under the Guaranty Agreement regardless of the provisions of the Bankruptcy Code. This reliance on a blanket statutory repealer finds no support in case law or proper statutory interpretation.

First of all, the repealer phrase modifies the phrase "is empowered . . . to provide by contract." The purpose of this repealer

---

**17.** Section 362(b)(7) [S. 2266 Sept. 7, 1978].

**18.** Automatic Stays II, at 30–31 n. 123.

phrase is not mentioned in the voluminous history of the National Housing Act, but the language was apparently included to allow GNMA summarily to terminate an issuer's rights upon default, despite other state or federal laws that might require judicial foreclosure of collateral, as opposed to unilateral action by a creditor. The effect of this phrase is that the question of whether GNMA can provide for extinguishment of the issuer's interest in the mortgages *by contract,* instead of through local foreclosure procedures, is decided in favor of uniformity of procedure throughout the country. With respect to actually implementing its contractual remedies after the issuer has filed for relief under Chapter 11 of the Bankruptcy Code, GNMA is in the same position as any other party in interest. Relief from the automatic stay must be requested and granted before a party in interest is entitled to enforce contractual or judicially created remedies.

■ The Bankruptcy Code and Section 306(g) of the National Housing Act are not in conflict; there is no provision in the Code which prohibits GNMA and any other party from providing for the termination of one party's interest without having to go through judicial foreclosure. What the Bankruptcy Code does say, however, is that GNMA, just as any creditor or party in interest, is stayed from enforcing its contractual remedies until authorized by the Bankruptcy Court.[19] Section 306(g) merely authorizes GNMA to create a contractual right to extinguish Adana's rights in the mortgages after a valid declaration of an event of default. Bankruptcy Code Section 362 provides that, after the filing of a petition for relief, such contractual rights cannot be exercised without judicial relief from the automatic stay.

However, even if Section 306(g) were construed to conflict with the automatic stay provisions of the Bankruptcy Code, the provisions of the Code, having been acted subsequently to Section 306(g) would prevail. Under fundamental principals of statutory construction, if "there is an irreconcilable conflict, the latter enactment will control, or will be regarded as an exception to or qualification of, the prior statute. It is not permissible to consider the advantage from a practical point of view of one statute over another, and on that basis construe the one producing the more practical results so as to suspend the other." 82 C.J.S. § 368 at 838–39. This analysis is bolstered by the fact that when the stay provisions of the Bankruptcy Code were enacted, Congress carefully considered the extent to which acts by the Department of Housing and Urban Development ("HUD") and its agencies, of which GNMA is one, 12 U.S.C. Section 1723(a), would be exempted from the prohibitions of the stay. For example, subsection 362(b)(7) granted HUD a special exception from the automatic stay for the purpose of bringing foreclosure actions against multi-family dwelling units, as discussed above. The legislative history of this subsection explains that Congress consciously and deliberately narrowed the exception previously granted to HUD under Section 263 and Section 517 of the former Bankruptcy Act.[20] According to fundamental principals of statutory construction, this congressional expression of one exception for HUD and its agencies indicates a legislative intent not to allow any other exceptions to HUD from the stay provisions of the Code. *Sutherland, Statutory Construction,* Section 47.23. *See, e. g.,* 82 C.J.S. § 333; 73 Am.Jur. 2nd Section 211. Hence if a conflict between Section 306(g) and the Bankruptcy Code did exist, the Code must prevail.

In support of its position that Section 306(g) of the National Housing Act and any regulations formulated by GNMA pursuant

---

**19.** See, *Continental Ill. Nat. Bk. & Trust Co. of Chicago v. Chicago, Rock Island & Pacific Railway. Co.,* 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

**20.** S.Rep.No. 95–989, 95th Cong., 2d Sess. (1978) at 52.

to that statute control the Bankruptcy Court, GNMA cites several cases, including *Cullen v. Bowles*, 148 F.2d 621 (2d Cir. 1945); *Zwick v. Freeman*, 373 F.2d 110 (2d Cir. 1967), cert. den. 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96 (1967); and *Tragash v. United States Department of Agriculture*, 524 F.2d 1255 (5th Cir. 1975). All of these cases are inapposite to the present fact situation. *Cullen v. Bowles* was decided on the single holding that "the only judicial remedy lay in the Emergency Court of Appeals . . .," at 624, and not bankruptcy law. All references in *Cullen* to bankruptcy are dicta, the case dealt with entirely different legislation than § 306(g)—the Emergency Price Control Act [21], enacted during a period of national emergency, and the case involved the Bankruptcy Act not the Bankruptcy Code.

As discussed above, the Congress specifically considered what governmental actions should be exempt from the Bankruptcy Code provisions and the exercise of GNMA's contractual remedies does not fall into the category of "police or regulatory powers." Given specific statutory treatment of the interface between government regulations and the Bankruptcy Code, the vaguely analogous, distinguishable *Cullen* case is not controlling.

Similarly, the cases of *Zwick v. Freeman*, and *Tragash v. United States Department of Agriculture* are also inapposite to the present fact situation. In *Zwick* the court held that the sanction provided by the Perishable Agriculture Commodities Act was not a "provable debt" and therefore not dischargeable under the Bankruptcy Act. *Zwick* at 116. The court in *Tragash* reasoned that:

> . . . "Congress did not intend to exempt bankrupts from the provisions of the Commodities Act, a view supported by

the absence of any reference to the Bankruptcy Act in the provision in question although other provisions of the Commodities Act do include references to bankruptcy." at 1257.

Applying this type of statutory construction to GNMA and the automatic stay, that is, HUD and secondary mortgages are mentioned in the Bankruptcy Code but no exception to the automatic stay is provided to GNMA, GNMA is not an entity exempt from the provisions of the Section 362 stay.

In analyzing the cases cited by defendant and the entire problem posed by this contempt action, it is important to note that the Court is not being asked to rule on the ultimate effect of GNMA's regulations. The issue before the court is simply whether GNMA is prevented from taking unilateral action by the force and effect of the automatic stay provided by Section 362 of the new Bankruptcy Code.

## PROPERTY OF THE ESTATE

GNMA contends that the property which GNMA sought to seize is not property "of the estate" within the meaning of Section 541 of the Bankruptcy Code, and that the property in question was also not "property from the estate" within the meaning of Section 362(a)(3), and that this fact gives it the unilateral right to seize the property without application to and the consent of the Bankruptcy Court.

The Bankruptcy Code clearly stays "any entity" from "any act to obtain possession of property *of the estate* or of property *from the estate*." Section 362(a)(3). Property classified in either of said categories, or in both, would be protected from the type of unilateral and unauthorized action taken by GNMA on March 3.

### Property of the Estate Defined

■ In the Code, Section 541 defines property of the estate and actions which

---

**21.** The Emergency Price Control Act provided that "no provision of law in force on the date of enactment of this Act shall be construed to authorize any action inconsistent with the provisions and purposes of this Act . . ." This is much different language even than that in § 306(g) of the National Housing Act which simply permits GNMA, notwithstanding any other law, state or federal, to provide for termination of the issuer's rights mortgages by contract rather than through judicial foreclosure.

may be taken with respect thereto. Subpart (a) of Section 541 defines "property of the estate" and Subparts (b), (c) and (d) create specific exceptions to the general rule stated in subpart (a). Section (a) gives a very broad definition to "property of the estate" as:

"all legal or equitable interests of the debtor in property as of the commencement of the case." Section 541(a)(1).

The legislative history of Section 541 leaves no doubt that the definition was intended to be as broad as the language indicates.

"The scope of the paragraph is broad. It includes all kinds of property, including tangible and intangible property, causes of action . . . and all other forms of property currently specified in section 70(a) of the Bankruptcy Act. The debtor's interest in property also includes 'title' to property, which is an interest, just as are a possessory interest, or leasehold interest, for example."

House Report No. 95–595, 95th Cong. 1st Sess. (1977) 367; Senate Report No. 95–989, 95th Cong. 2d Sess. (1978) 82, U.S.Code Cong. & Admin.News 1978, p. 6323.

"... Section 541(a) is an ill-embracing definition which includes charges on property, such as liens held by the debtor on property of a third party, or beneficial rights and interest, that the debtor may have in property of another."

124 Cong.Rec. Hll,096 (Sept. 28, 1978) (Statement of Rep. Edwards) S. 17,413 (Oct. 6, 1978) (Statement of Sen. DeConcini).

Carved from this "all-embracing definition" of the bankruptcy estate created by Section 541 are three limited exceptions.

(b) Property of the state does not include any power that the debtor may only exercise solely for the benefit of an entity other than the debtor.

(c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2),

or (a)(5) of this section notwithstanding any provision—

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or the taking possession by a trustee in a case under this title or custodian, and that effects or gives an option to effect a forfeiture, modification, or term of the debtor's interest in property.

(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title.

(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

If the three types of property which the government tried to seize fall within the section 541(a) definition of the estate and are not excepted by Sections 541(b), (c) or (d), then actions against these properties are prevented by Section 362(a). Each of the three types of property will be discussed separately below.

### Guaranty Agreements

The facts establish that the servicing rights under the Guaranty Agreements existing on February 1, 1980 at the time of filing of this Chapter 11 petition was a valuable asset to the Debtor, valued by the Debtor at $700,000.00 to $1,000,000.00, and

that it is marketable under normal or present circumstances.[22] By the letter of February 6, 1980, GNMA attempted to terminate Debtor's issuer status under the Agreements, thereby rendering the servicing portfolio worthless to the Debtor and creditors in this case. The servicing is virtually the sole, certainly the primary, unencumbered asset, of the Debtor. Without the servicing contract, or its value (which would provide a comparable stream of income), the chances of a successful rehabilitation would be remote, if not impossible.

It is undisputed that, as of February 1, 1980, the Debtor had a contractual right to perform the functions of an issuer and servicer under the Guaranty Agreement. The record also shows that the Debtor continued to have such contractual rights through February 5, 1980. GNMA argues, however, that on February 6, 1980 when it delivered its letter of extinguishment to the Debtor, the Debtor's rights under the contract were terminated and hence no longer property of the estate. Such termination may have occurred if the letter of extinguishment had been delivered prior to the filing of the bankruptcy petition, but, it is circular reasoning to say that the automatic stay does not apply because actions taken after the stay went into effect terminated the Debtor's interests. The purpose of the stay is to prevent the taking of just such actions against a debtor.

▮ The debtor's interest in the servicing contract is property of the estate. Section 70(a) of the prior Bankruptcy Act dealt with the issue of what property properly belonged to a bankrupt's estate. Section 541 of the Bankruptcy Code, the successor of prior Section 70(a), includes within the definition of property of the estate "all other forms of property currently specified

in Section 70(a) of the Bankruptcy Act ..." House Report No. 95–595, 95th Cong. 1st Sess. (1977) 367; Senate Report No. 95–989, 95th Cong. 2d Sess. (1978) 82, U.S. Code Cong. & Admin. News 1978, p. 6323. Thus, property covered under Section 70(a) of the prior Act is "property of the estate" under Section 541 of the new Code.

Property as defined in Section 70(a)(5) included all property "which could by any means have been transferred or otherwise seized, impounded or sequestered."

The testimony of both the GNMA and the Debtor agree that under the Guaranty Agreements, in certain circumstances such as a valid pre-petition default, GNMA could cancel the agreements, seize the mortgages and take over the servicing functions of any mortgage banker. Moreover, GNMA has admitted that the servicing contract of Adana could have been transferred with GNMA approval. Thus, the Debtor's interest in the servicing contract was not only subject to termination and seizure, but was transferable under certain circumstances. In a prior decision involving Section 70(a)(5) of the Bankruptcy Act, the Supreme Court held that a seat on the New York Stock Exchange was property of the estate.

> "was the seat in the stock exchange property which could have been *by any means* transferred, or which might have been levied upon and sold under judicial process? If the seat was subject to either manner of disposition it passed to the trustee of the appellant's estate. *Page v. Edmunds*, 187 U.S. 596, 23 S.Ct. 200, 47 L.Ed. 318 (1903). [Emphasis supplied]

Thus, the Debtor's interest in the servicing contract is "property of the estate" under Section 70(a)(5) of the prior Act because it could be transferred or seized under certain circumstances. The Debtor's inter-

---

**22.** An order of this Court was entered on May 1, 1980, upon application and agreement among the Debtor and the three line banks and without opposition by GNMA, after notice thereof to GNMA, requires that, if GNMA is successful in terminating the Debtor's right to continue servicing the mortgages, the servicing portfolio will be sold in a commercially reasonable manner to a purchaser approved by GNMA. The proceeds of any such sale will be placed in the estate, pursuant to the aforesaid order. *See also* discussion *infra*.

est in the servicing is likewise property of the estate under 11 U.S.C. 541 because the legislative history makes it clear that all property covered under Section 70(a) of the prior Act is within the definition of "property of the estate."

 Contractual rights are intangible property within the scope and protection of the automatic stay. Moreover executory contracts, like the Guaranty Agreements, are specifically treated by the Code in Section 365, which grants a debtor the right to assume or reject most executory contracts in a reorganization case at any time prior to the confirmation of a plan. Although certain types of contracts are excepted from the Debtor's right to assume by Section 365(c), any party to such a contract seeking a determination of its rights prior to acceptance or rejection by the debtor must follow the procedures specifically set forth in Section 365. or in Sections 362(d) and (e) to obtain such relief. GNMA argues that Section 365(c)(1) and (2) both prohibit this Debtor from assuming the Guaranty Agreements and, therefore, that GNMA could take actions to terminate the Agreements. Even if the Court were disposed, at a later date, to find that Section 306(g) of the National Housing Act excuses GNMA from accepting performance from an assignee of the Debtor and that the Guaranty Agreements are contracts to make a financial accommodation to the Debtor,[23] it is the *Bankruptcy Court*, not GNMA acting unilaterally, which must determine whether the exceptions of Section 365(c) apply and whether the Debtor will be permitted to assume the Guaranty Agreements.

"The provision for an automatic stay in Section 362(a) of the Bankruptcy Code will prevent any immediate, ex-parte termination of a contract or lease by the non-debtor party. Under Section 362(d), however, the non-debtor party can seek relief from the stay, to allow it to terminate the contract or lease." [24]

 Being an asset of the Debtor, Debtor's rights under the Guaranty Agreements are protected by the Section 362(a) stay and may not be terminated unilaterally; nor may any other property right accruing thereto be seized by GNMA. This Court holds that the Guaranty Agreements continued in full force and effect after the filing of the Debtor's Chapter 11 petition, pending action by GNMA under the Rules of this Court and further order of this Court to obtain relief from the stay.

### Custodial Accounts

 The facts show that the bank accounts were established by the Debtor, deposits were made thereto by the Debtor and were administered by the Debtor pursuant to the Guaranty Agreements with GNMA. The funds deposited in these accounts are paid monthly by the Debtor either to the certificate holders or to satisfy the tax and insurance bills on the residential properties covered by the underlying mortgages and are, therefore, essential to the Debtor's performance of its duties under the Guaranty Agreement. Under the custodial agreements with the line banks, the Debtor was the only entity that could draw checks upon the custodial accounts or obtain possession of the mortgages from the custodians, and hence the Debtor clearly had control over these properties at the time of the attempted seizure by GNMA.

---

**23.** "The present wording of § 365(e) which refers to § 365(c) does not make it clear that the right to reaffirm executory contracts does not extend to lending commitments and further deliveries of equipment under master leases. We believe that this problem must be met by a clear amendment of § 365 to *preclude the preposterous situation of a lending institution being required to make loans to a bankrupt.*" [Emphasis supplied] *Hearings Before the Subcommittee in Judicial Machinery of the Senate Judiciary Committee on S. 2266 and HR 8200,* 95th Cong., 1st Sess: 576 (1977) (statement of Robert J. Grimmig and John W. Ingraham on Behalf of the American Bankers Association and Robert Morris Associates.)

**24.** Fogel, *Executory Contracts and Unexpired Leases in the Bankruptcy Code,* 64 U. of Minn. L.R. 342, 365 (1980).

It is true that the custodial agreements required the custodians to turn over to GNMA the money in the accounts and the mortgages upon notification to do so by GNMA. However, no such notification had been given to the custodians prior to the filing of the bankruptcy petition, and hence the Debtor's control over these properties was in full force and effect at the date of the filing and entry of the order of relief by this Court. 11 U.S.C. Section 301. Actions taken by GNMA, after the filing of the petition and the simultaneous attachment of the protection of the automatic stay, could not have removed the property from the control of the Debtor without violating the provisions of Section 362(a)(3). Title or ownership of property is not controlling to a Section 362(a)(3) violation. Possession or control by the debtor is sufficient to enact the protection of the automatic stay. The prohibition against any act to remove property *from* the estate was apparently "included to forestall a lienor or other adverse claimant from asserting as a justification for an exercise of self-help that the property taken from the debtor did not belong to the estate." [25] The accounts clearly were under the control of Debtor at the time of filing. Thus, regardless of whether they are property *of* the estate, the accounts constituted property *from the estate* at the time of filing and were under the protection of Section 362(a)(3). The actions taken by GNMA to attempt to divest the Debtor of control and to obtain possession of these accounts were, therefore, in violation of the automatic stay.

## MORTGAGES

■ Record title to the mortgages which GNMA attempted to seize on March 3, 1980 is in Adana, however, at sale of the securities and issuance of the guaranty, the mortgages were automatically assigned to GNMA pursuant to the terms of the Guaranty Agreements. The custodial banks hold the mortgages, subject to direction by

Adana under custodial agreements required by the Guaranty Agreements. With respect to the mortgages, GNMA contends that they were not property of the estate because of the effect of Section 541(d) of the Code and the assignment of the mortgages to GNMA. GNMA also contends that, at best, any rights of the debtor in the mortgages are "so minimal as to make any exercise of the contempt power . . . inappropriate." Section 541(d) provides that

"Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, *sold by the debtor* but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." [Emphasis supplied].

The purpose of this exception is made clearer by the legislative history.

Section 541(e) confirms the current status under the Bankruptcy of bona fide secondary mortgage market transactions as the purchase and sale of assets. Mortgages or interests in mortgages sold in the secondary market should not be considered as part of the debtor's estate. To permit the efficient servicing of mortgages or interests in mortgages the seller often retains the original mortgage notes and related documents and the purchaser records under state recording statutes the purchaser's ownership of mortgages or interests in mortgages purchased. Section 541(e) makes clear that the seller's retention of the mortgage documents and the *purchaser's* decision not to record do not impair the asset sale character of the secondary mortgage market transactions. The committee notes that in secondary

---

**25.** Automatic Stays II, at 16.

mortgage market transactions, the parties may characterize their relationship as one of trust, agency, or independent contractor. *The characterization adopted by the parties should not affect the statutes [sic] in bankruptcy of bona fide secondary mortgage market purchases and sales.* Senate Report No. 95–989, 95th Cong. 2d Sess. (1978) 83–4. [The reference to section (e) should be to section (d). The word "statutes" in the last sentence should be "status."] [Emphasis supplied].

This Code section came about as the result of two cases, *In re Fidelity Mortgage Co.*, Bankruptcy Case No. J77–00412B (S.D. Miss. Oct. 27, 1977), and *In re Hamilton Mortgage Co.*, Case No. BK–1–70–264 (E.D. Tenn., 1976). In these two cases, the trustees argued that the loan participations were actually borrowings by the mortgage bankers and that the purchasers of the participations were in fact only unsecured creditors instead of purchasers of assets.[26] In the *Hamilton* case (later settled) the trustee argued that

those who had thought that they had purchased participation interests in mortgage loans were not owners at all, but ... mere lenders. Worse than that, he claimed that their interests were "untransferred, unendorsed, unassigned, and/or undelivered" and therefore vulnerable to claims of priority by lien creditors under Section 9–301(1)(b) of the Uniform Commercial Code and consequently to the trustee in bankruptcy under the "strong-arm" provisions of the Bankruptcy Act.[27]

This case was later settled and no opinion was written. In the *Fidelity Mortgage*

case, involving some $60 million in GNMA guaranteed participation interests:

the trustee argued that the failure of the participation purchaser to record his ownership interest under the state recording statute resulted in the trustee acquiring title to the underlying mortgages by virtue of the "strong-arm clause" of section 70(c) of the Bankruptcy Act.[28]

In this case the Bankruptcy Judge issued an order in favor of the trustee finding that:

Even though GNMA is a governmental, or quasi-governmental agency, the Bankruptcy Act is also a Federal law which has been in existence much longer than GNMA. The Bankruptcy Act was intended to deal uniformly with the problems of insolvents, and to that end the Trustee has special statutory powers to recover and retain properties for the benefit of the common creditors of the bankrupt estate. If there was an assignment of the asset in question to GNMA, this Court believes it should meet all of the tests which are applicable to the perfection of any other assignments of real property interests in the State of Mississippi.

The Court concludes that the Bankruptcy Act which embraces the lien perfection requirements of the State of Mississippi, takes precedence over any conflicting provisions in the statute creating GNMA.[29]

Reacting to both of these decisions, the President of the Federal Home Loan Mortgage Corporation on January 24, 1980, wrote to counsel for the Senate Judiciary Committee and proposed that a new subsec-

---

**26.** Senate Hearings on S. 2266 and HR 8200 at 1133 (letter of Philip R. Brinkerhoff, President, Federal Home Loan Mortgage Corporation, dated January 24, 1980, to Robert Fiedler, Counsel, Sen. Judiciary Committee.

**27.** Lapine, *Loan Participations and the Savings and Loan Association: A Sleeping Giant Stirs*, 11 Akron L.R. 457, 479 (1978); See also *NOTE: Security Interests in Notes and Mortgages: Determining the Applicable Law*, 79 Col.L.J. 1414 (1979).

**28.** Senate Hearings on S. 2266 and HR 8200 at 1150 (memorandum prepared by the Federal Home Loan Mortgage Corporation accompanying letter of Phillip R. Brenberhoff).

**29.** *In re Fidelity Mfg. Co.*, Case No. J77–00412B (S.D.Miss. Oct. 27, 1977) (unreported decision).

tion be added to section 541 and also included material for inclusion in the legislative report.[30] The new section eventually became Section 541(d), with certain significant amendments.

It is clear from a reading of the legislative history of this section that its purpose is to protect those who *purchase* interests in mortgages in the secondary market but who do not record their purchase in order to allow the seller (i. e., people who sell securities in the secondary market) to continue to service the mortgages without increased paperwork. Senator DeConcini, the Senate subcommittee chairman and floor manager of the bankruptcy reform legislation, said in a prepared joint House Senate statement on October 6, 1978:

> Even if a mortgage *seller* retains, for purposes of servicing, legal title to mortgages or interest in mortgages *sold* in the secondary mortgage market, the trustee would be required, by section 541(d) to turn over the mortgages or interests in mortgages to the *purchaser* of those mortgages.

> The *seller* of mortgages in the secondary mortgage market, will often retain the original mortgage notes and related documents and the *seller* will not endorse the

notes to reflect the *sale* to the purchaser. Similarly, *the purchaser* will often not record the *purchaser's* ownership of the mortgages or interest in mortgages under state recording statutes. These facts are irrelevant and the *seller's* retention of the mortgage documents and the *purchaser's* decision not to record do not change the trustee's obligation to turn the mortgages or interests in mortgages over to the *purchaser.* The application of section 541(d) to secondary mortgage market transaction will not be affected by the terms of the servicing agreement between the mortgage servicer and the *purchaser* of the mortgages. Under section 541(d) the trustee is required to recognize the purchaser's title to the mortgages or interests in mortgages and to turn this property over to the *purchaser.* It makes no difference whether the servicer and the *purchaser* characterize their relationship as one of trust, agency, or independent contractor.

The purpose of section 541(d) as applied to the secondary mortgage market is therefore to make certain that secondary mortgage market *sales* as they are currently structured are not subject to challenge by bankruptcy trustees and that

---

**30.** "The requested legislative confirmation could be easily accomplished by the addition of subsection (e) to section 541 of S 2266 as follows:

> "(e) Notwithstanding the provisions of subsection (a) of this section or section 544, mortgages secured by real property or interests in such mortgages sold by the debtor but as to which the debtor has retained legal title for purposes of servicing, or supervising the servicing of, the mortgages of interest therein shall be deemed property held by the debtor as agent for the owners or holders of such mortgages or interests in mortgages an shall not become property of the estate."

The Corporation emphasizes that the language suggested has been narrowly drafted to accomplish the single goal of confirming the asset sale status of secondary mortgage market transactions. The suggested language makes no change in present law and is necessary to avoid any implication that section 541(a) or section 544(a)(3) is designed to change the bankruptcy status of typical secondary mortgage market transactions.

The Corporation also suggests that the following language be inserted in the Committee Report to explain the purposes of section 541(e):

> "Section 541(e) confirms the current status under the Bankruptcy Act of bona fide secondary mortgage market transactions as the purchase and sale of assets. Mortgages or interests in mortgages sold in the secondary market should not be considered as part of the debtor's estate. To permit the efficient servicing of mortgages or interests in mortgages the seller will often retain the original mortgage notes and related documents, and the purchaser will not record under state recording statutes the purchaser's ownership of the mortgages or interests in mortgages purchased. Section 541(e) makes clear that the seller's retention of the mortgage documents and the purchaser's decision not to record do not impair the asset sale character of secondary mortgage market transactions."

Sen. Hearings on S 2266 and HR 8200 at 1160, 1161.

*purchasers* of mortgages or interests in the mortgages which they have purchased from trustee without the trustee asserting that a sale of mortgages is a loan from the *purchaser* to the *seller*.[31] [Emphasis supplied].

The comments by Senator DeConcini and the comment in the legislative history, which was prepared by the Federal Home Loan Mortgage Corporation, show that Section 541(d) was intended to protect *purchasers* of the mortgage backed certificates.

> The Corporation emphasizes that the language suggested has been narrowly drafted to accomplish the single goal of confirming the asset role status of secondary mortgage market transactions.[32]

Although the language and legislative history of Section 541(d) suggest that, if the assignment of the mortgages by the Debtor to GNMA in the Guaranty Agreements was, in fact, a "sale" by the Debtor to GNMA, wherein the Debtor retained record title solely for purposes of servicing the mortgages, then the Debtor would be required to surrender the mortgages to GNMA, the language does not give GNMA the right to use self-help to obtain possession of the mortgages. There is a significant difference between having the right to receive possession of the mortgages from the Debtor and having the right to unilaterally enforce that right after the automatic stay goes into effect. After the filing of a bankruptcy petition, only parties whose enforcement actions are excepted from the application of the automatic stay may enforce the rights without Court approval. All non-exempted enforcement actions must await court approval before they can be exercised; if this were not true, the fresh-start purpose of the Bankruptcy Code would be thwarted by the furious rush of the debtor's creditors to exercise their rights and remedies.

GNMA contends that even legal title to the mortgages had passed from Adana to GNMA under the Guaranty Agreements, and hence, Adana had no interest in the mortgages. GNMA argues that since Adana had no interest in the mortgages, actions to seize the mortgages could not violate the automatic stay. It is not necessary, however, to determine the precise ownership interests of Adana, GNMA and the securities holders in and to the mortgages in order to determine whether GNMA's attempted seizure of the mortgages constituted a violation of the automatic stay. The attempted seizure did violate the stay because it was an action designed to take property *from* the bankruptcy estate.

The custodial agreements with the banks holding the mortgages,[33] as well as the Guaranty Agreements and GNMA Guide, provided that the Debtor was the only entity allowed to remove documents from the custodians' possession. The Debtor was authorized to take certain actions, such as foreclosing on the mortgages in its own name, and only the issuer could take these actions. Clearly, the Debtor had possession and/or control over the loan documents at the date of filing, and, hence, actions taken by GNMA to obtain possession of the mort-

---

**31.** Senate Debate on Compromise Bill, 124 Cong. Rec. S 17403–34 (daily ed. Oct. 6, 1978) pages S17409–17410. [Emphasis supplied] (statement of Sen. DeConcini).

**32.** Sen. Hearings on S. 2266 and HR 8200 at 1161.

**33.** Custodial Agreement for Mortgage-Backed Securities dated February 24, 1976.
"IV From time to time as appropriate for the servicing, prepayment, or foreclosure of mortgages, custodian will release to Issuer the mortgage documents in the custody of Custodian ..."

"V At any reasonable time, the Custodian will make available the documents in its custody and its accounts and records pertaining thereto for examination ..."
"VI A. Upon representation to Custodian by GNMA that a default has occurred under the terms and provisions of the mortgage-backed securities, Custodian will comply with such requirements as GNMA shall make, such compliance including, but not necessarily being limited to, the delivery with appropriate endorsements to GNMA of all loan documents in Custodian's custody."

gages were actions to take property *from* the estate of the Debtor in violation of Section 362(a)(3).

## A COVENANT AGAINST FILING A BANKRUPTCY PETITION IS VOID

■ GNMA also argues that Adana's petition for relief under Chapter 11 of the Bankruptcy Code is void because of an agreement with GNMA not to file a bankruptcy petition without prior notice to GNMA.

It is clear that ". . . an advance agreement to waive the benefits of the [Bankruptcy] Act would be void." *Fallick v. Kehr*, 369 F.2d 899, 904 (2d Cir. 1966). That principle, according to the court, is based upon the strong legislative purpose of the Bankruptcy Act to provide a "fresh start" to debtors. As stated in *In re Weitzen*, 3 F.Supp. 698 (S.D.N.Y.1933): "to sustain a contractual obligation of this character would frustrate the object of the Bankruptcy Act." In the leading case on the subject, *Federal National Bank v. Koppel*, 253 Mass. 157, 148 N.E. 379 (1925), the court, holding that an advance contractual waiver did not bar the filing of a bankruptcy case or render the resulting discharge in bankruptcy unenforceable, stated (253 Mass. at p. 159, 148 N.E. 379):

> The bankruptcy act would in the natural course of business be nullified in the vast majority of debts arising out of contracts, if [an advance waiver] were permissible. It would be vain to enact a bankruptcy law with all its elaborate machinery for settlement of the estate of bankrupts debtors, which could so easily be rendered of no effect.

The debtors had an inviolate right of access to the courts of bankruptcy to seek rehabilitation. *In re Mt. Forest Fur Farms of America, Inc.*, 103 F.2d 69, 71 (6th Cir. 1939); *In re Pine Tree Feed Co., Inc.*, 112 F.Supp. 124, 126 (D.Me.1953).

The consequences of the proposition as alluded to by the court in *Koppel*, are al-most unthinkable. If an advance waiver of the right to file a bankruptcy case were enforceable, the availability of Bankruptcy Code benefits could be nullified in most commercial cases merely by the lender's inclusion of a waiver clause in the standard form of contract it requires of the borrower. The lending community, including federal agencies, through the provisions of their forms of credit instruments, would determine the extent, if any, of access to the bankruptcy courts *rather* than the statute itself.

Any reliance on *D. H. Overmeyer v. Frick* and *National Equity Rental, Ltd. v. Szukent* is misplaced. Those cases only stand for the proposition that a *legally valid* waiver of non-Bankruptcy Act rights will be enforced if it was knowingly given by one party to a contract whose bargaining power was relatively equal to the other's; the issue in those cases was not the validity of the waiver, but the claim of unenforceability because of unequal bargaining power. *Cf., Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). A waiver, even a bargained-for and knowledgeable one, of the right to seek protection of the Bankruptcy Act is *void* under the principles of *Kehr* and *Koppel*.

## CONTEMPTS

■ GNMA contends that even if the action of GNMA in its letter of February 6, 1980, attempting to terminate the debtor's status as "Issuer" under the Guaranty Agreements, and the actions taken by GNMA on March 3, 1980, attempting to seize the custodial bank accounts and mortgages, are held to be in violation of the Section 362(a) automatic stay of the Bankruptcy Code, the Court, nevertheless, should not order sanctions against GNMA or any of the individual defendants because such actions of contempt were not in fact wilful and deliberately contemptuous. The Court disagrees. That deliberately contemptuous is demonstrated by the facts and arguments presented in this case, by the involvement

and experienced with the Bankruptcy Code, of the officials of GNMA in monitoring the drafting of the Bankruptcy Reform Act of 1978, and by prior litigation involving bankrupt mortgage bankers in which GNMA was a party.

Admissions by counsel for GNMA during the hearing on the debtor's contempt motion demonstrate that GNMA was well aware of the interface between 11 U.S.C. § 541, defining property of the estate, and the automatic stay provisions of 11 U.S.C. § 362. At one point in oral argument counsel for GNMA stated that GNMA took the actions complained of by debtor under consideration now in this proceeding specifically for the purpose of obtaining a judicial ruling as to whether such actions taken by GNMA are governed by the Bankruptcy Code or are exempt by virtue of GNMA's enabling statute, Section 306(g) of the National Housing Act. Counsel stated that officers, defendants herein, had kept abreast of the developments in the enactment of the Bankruptcy Reform Act, had even negotiated and influenced amendments thereto, and knew its scope. Thus, GNMA was fully cognizant that the automatic stay provisions would apply to all entities and all actions, but for the alleged possible exemption. The exemption claimed by GNMA under said Section 306(g) of the NHA is fanciful and specious, in view of the more recent and long considered Bankruptcy Reform Act of 1978, which did not specifically exempt GNMA from operation of the automatic stay of the Bankruptcy Code. Although Section 306(g) and the corresponding regulations issued thereunder and other equitable considerations may provide grounds for GNMA to receive relief from the automatic stay upon proper application to the Court, it is not a part of, amendatory to or applicable or relevant to the Bankruptcy Code and does not provide a statutory or automatic exemption from the stay. The automatic stay provisions of Section 362(a) are intended to be all-pervasive to all entities having relationships or contacts with a debtor, except for the statutory exceptions listed in Section 362(b). Absent a statutory exception, a party in interest must seek court approval for relief from the stay, pursuant to Sections 362(d) through (g). There is no statutory exception in the Bankruptcy Code for the actions taken by GNMA. Hence, GNMA was seeking to usurp the function of the Court by determining, unilaterally, and outside the Bankruptcy Court, that the stay should be lifted. This unilateral action, taken willfully and deliberately and with knowledge of the scope of Section 362, was a violation of the clear meaning, purpose and objective of Section 541 and Section 362(a), and was therefore contemptuous.

The fact that GNMA was well aware of the scope and operation of Section 362(a) and Section 541 is further demonstrated by the very active role taken by GNMA during congressional hearings on the Bankruptcy Reform Act of 1978. In oral argument, counsel for GNMA admitted that the Bankruptcy Reform Act was closely monitored by GNMA and the Attorney General's office throughout its consideration by Congress. GNMA and the officials of GNMA cannot and, in fact, do not plead ignorance of the existence of provisions of the Bankruptcy Code affecting lenders and federal agencies engaged in the lending market. Indeed, GNMA and its officials were actively involved in the very process which created these provisions. The actions taken by GNMA, given this knowledge, were contemptuous.

Finally, GNMA was well aware of the problems raised by considering the mortgages serviced by a mortgage banker to be a part of the mortgage banker's bankruptcy estate. GNMA was involved in the *In re: Fidelity Mortgage Co.* case discussed above, where the court held GNMA subject to state perfection statutes, and hence subject to challenge by a bankruptcy trustee using the "strong-arm" section of the former

Bankruptcy Act.[34] GNMA officials must have been aware that Congress considered several legislative alternatives to rectify the problems created by the *Fidelity* case. GNMA also knew that Congress ultimately adopted Section 541(d) which provides that the legal title held by the debtor-mortgage banker becomes part of the estate, while the equitable interest belonging to the purchasers would not. The participation of GNMA in the litigation referenced above and the subsequent monitoring of the provisions of the Bankruptcy Reform Act, demonstrate that the defendants were, at the time of the actions under scrutiny here, fully cognizant of the meaning of Section 362 and the definition of property of the estate in Section 541, and knew full well that legal title to the mortgages had passed into the estate and was, hence, protected by the automatic stay. In light of this knowledge it is impossible to characterize GNMA's actions to obtain possession of the mortgages as under color of right and not knowing and wilful. The actions were deliberate, knowing and wilful and in contempt of the automatic stay.

## SANCTIONS

Were the wilful and deliberate and contemptuous actions which have been taken by the defendants taken without harm to the Debtor or other parties in interest, as contended by GNMA, and, therefore, undeserving of sanctions? The Court thinks not.[35]

The attempted termination of the debtor's Issuer status under the Guaranty Agreements would have effectively terminated a good portion of the debtor's business and gross revenues. The attempted seizure of the custodian bank accounts and the mortgages from the line banks, would have completely terminated the debtor's business activities with respect to the GNMA system. This is not the type of action to be taken unilaterally, without court authority, after the filing of a Chapter 11 petition, and the debtor and other parties in interest were compelled to act immediately to protect the estate. The resulting application for contempt and injunction filed by the debtor, and the intervention by the major creditor of the estate, created work and litigation which was pressing and demanding to the debtor and the participating creditors. An adversary proceeding (such as that subsequently filed by GNMA) was the proper procedure to be followed by GNMA and, had that procedure been followed from the outset, the debtor and its creditors could have avoided both the work necessary to halt GNMA's unilateral action and the redundancy of effort brought about by the simultaneous consideration of both the contempt action and the GNMA action for relief from stay. Unquestionably, the potential reorganization and the formulation and presentation of a plan have been delayed and eroded. The actions of defendants have been unwarrantedly expensive to debtor and the major creditors. For all these reasons, the contemptuous actions of the defendants were costly to both the debtor and the creditors which were actively involved in the case.

The fact that the defendants are an agency of the United States and officials of an agency of the United States cannot excuse their contempt for the orders of this Court, the provisions of the Bankruptcy Code and the rights of the other parties in interest and debtor in this case. It may, in fact, make the actions even more demanding of sanctions. We are dealing with officials who are highly knowledgeable, responsible

---

**34.** Disappointingly, in response to a question of this Court to GNMA counsel at the hearing as to whether any court had ever ruled on the relationships of the property interests of the parties to the Guaranty Agreement, the response was in the negative. Independent research of this court produced the cases cited on p. 1006 and the correspondence to the Congress.

**35.** *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977).

rather than some uninformed lay party. Nevertheless, the circumstances of the present case make it unnecessary to decide whether a higher standard of care should normally apply to government officials in cases of this nature. The defendants actions of February 6 and March 3 were so clearly contemptuous, and so clearly costly to the debtor and the participating creditors, that sanctions must, and will, be applied.

WHEREFORE, the Court does find and conclude that the defendants are in civil contempt of the order of relief and the automatic stay of this Court in this case.

The Court will conduct a hearing within thirty days of the date of this Order, upon notice to the parties to this action, to determine which defendants should be charged with sanctions and what the appropriate sanctions might be, including whether the defendants should be required to reimburse the Debtor and participating creditors for expenses and attorneys' fees incurred in connection with resisting the defendant's contemptuous actions, litigating this contempt action, and otherwise protecting the Debtor's estate.