In re LEMONS & ASSOCIATES, INC., Nevada corporation, Debtor.

Brian W. HATOFF, et al., Plaintiff, Plaintiff/Intervenor,

v.

LEMONS AND ASSOCIATES, INC., a Nevada corporation, et al., Defendant, Defendant/Intervenor.

Leroy R. BERGSTROM, Trustee et al., Plaintiff, Plaintiff/Intervenor,

v.

E.J. and E.C. BOONE, et al., Defendants, Defendant/Intervenor.

Leroy R. BERGSTROM, Trustee et al., Plaintiff, Plaintiff/Intervenor,

v.

Theodore W. and Hazel M. GAUERT, et al.

Leroy R. BERGSTROM, Trustee, et al., Plaintiff, Plaintiff-Intervenor,

v.

Theodore W. and Hazel M. GAUERT, et al., Defendants, Defendants-Intervenor.

Austen L. HAYDIS, et al., Plaintiff, Plaintiff-Intervenor,

v.

LEMONS AND ASSOCIATES, INC., a Nevada corporation, et al., Defendants, Defendants-Intervenor.

Bankruptcy No. BK–S–85–273.
Adv. Nos. 85–067, 85–068, 85–076 and 85–079.

United States Bankruptcy Court, D. Nevada.

Sept. 19, 1986.

Linda Riegle, Lionel, Sawyer & Collins, Las Vegas, Nev., Bert Goldwater, Lionel, Lawyer & Collins, Reno, Nev., for debtor.

Luther Kent Orton, Christina R. Pfirrman, Brobeck, Phleger & Harrison, San Francisco, Ca., Jeffrey L. Hartman, Reno, Nev., Mike K. Nakagawa, Mark Gorton, Cooper & Shaffer, Sacramento, Ca., for trustee/plaintiff Leroy R. Bergstrom.

J. Stephen Peek, Victoria S. Mendoza, Hale, Lane, Peek, Dennison & Howard, Reno, Nev., for plaintiffs/intervenors Haydis and Hatoff.

John J. Dawson, Craig D. Hansen, Streich, Lang, Weeks & Cardon, P.C., Phoenix, Az., for intervenor Beneficiary Committee.

Cheryl A. Skigin, Reno, Nev., for defendants-intervenors E.J. and E.C. Boone.

Bruce T. Beesley, Robinson, Lyle, Belaustegui & Robb, Reno, Nev., for defendant/intervenor Sherrick.

John C. Renshaw, Sallie B. Armstrong, Vargas & Bartlett, Reno, Nev., for intervenor Unsecured Creditors.

## MEMORANDUM DECISION

### ROBERT CLIVE JONES, Chief Judge.

Lemons and Associates, Inc. and related entities ("Lemons") filed under Chapter 11 of the Bankruptcy Code in April 1985. Immediately at issue was the status of several thousand "investors" who may have ownership rights in promissory notes secured by deeds of trust on real property. The above-captioned adversary proceedings were chosen as "test cases" and consolidated for trial of their common legal issues. In each case the parties sought, among other things, declaratory and affirmative relief concerning the investors' rights to the notes under 11 U.S.C. § 541(d). The investors claimed an alternative right to secured creditor status under 11 U.S.C. § 365(i) and (j).

Accordingly, having conducted a trial of these proceedings and having considered the entire record established in conjunction therewith, the Court hereby makes its Findings of Fact and Conclusions of Law. Bankruptcy Rule 7052. Any Finding of Fact which may be more appropriately categorized as a Conclusion of Law shall be deemed as such. Any Conclusion of Law which may be more appropriately categorized as a Finding of Fact shall be deemed as such.

## FINDINGS OF FACT

With respect to each adversary proceeding and the separate investors party thereto, the Court hereby adopts the detailed Findings of Fact filed by the Trustee and Committee of Unsecured Creditors on January 17, 1986 with the addition of the following:

Lemon & Associates, Inc. was incorporated under the laws of the State of Nevada on February 20, 1979. Its first office, and later its headquarters, was located in Reno, Nevada and it eventually opened branch offices in Las Vegas, Nevada and Scottsdale, Phoenix and Tucson, Arizona.[1] Lemons held licenses as a mortgage company and/or mortgage broker in both Nevada and Arizona. On April 10, 1985, the same day Lemons filed its petition in this Court, the Financial Institutions Division of the Nevada Office of the Department of Commerce revoked Lemons' license to operate as a mortgage company. At that time, approximately 3,500 Lemons investors claimed over 6,000 separate trust deed investments.

### 1. *The Presentation to Investors*

Lemons represented and advertised itself as a mortgage broker engaged in brokering

---

1. Lemons also briefly operated an office in Boise, Idaho which was treated for administrative purposes as part of the Reno office.

real estate loans and in buying and selling promissory notes secured by deeds of trust encumbering Nevada and Arizona property. Lemons placed advertisements with various newspapers and radio stations and widely distributed a general advertising brochure which was customarily given to individual as well as institutional investors. In this brochure, Lemons represented that it was a fully bonded mortgage company, licensed by the states of Nevada and Arizona, all of whose associates had strong backgrounds in mortgage banking, commercial banking, consumer lending and real estate development. It also represented: (1) that the company acted as a broker in the sale to investors of notes secured by deeds of trust; (2) that the trust deed investments earned at least 3½ percent above the prime lending rate; and (3) that these trust deeds were negotiable and readily saleable.

Lemons solicited investors of widely varying levels of financial sophistication and resources. While some of the more than 3,000 investors still involved in Lemons reside in virtually every state of the Union, the majority live in close proximity to the various Lemons branch offices in Nevada and Arizona.

Depending upon their investment goal, level of sophistication, and the inquiries they made, investors were given differing amounts of detailed information about their particular investment. However, certain representations were made almost invariably to all investors. Investors were told, and they intended and believed, that they were purchasing interests in promissory notes and that their investments would be secured by an assignment to them of a *pro rata* share in the deed of trust which had been executed in connection with a particular promissory note. Investors were also told that they would be paid a guaranteed rate of interest, calculated from the date they transferred funds to Lemons, and generally that their investment would be for a period of one year. At the end of one year, investors could either "withdraw" their funds or "roll over" their investment, either for another year in the same note and deed of trust or into another note and deed

of trust. These representations were made to investors regardless of the terms, maturity date or performance history of their particular note, if a note had been specifically identified at that time. Many investors also received the additional representations that they could "withdraw" their monies in less than a year under certain circumstances and that, in the case of a borrower default on their note, Lemons would "transfer" their investment to another note thereby making their investment riskless. In addition, on many occasions, investors were promised an interest rate in excess of the interest rate of the note with which they were associated. Lemons represented that it could offer this higher rate because it had received loan points from the borrower which it would share with the investor in the form of a one or two percent higher interest rate.

At the time of their investment, some investors selected the particular note and deed of trust with which they wanted to be associated. Some made this selection solely on the basis of "loan inventory sheets" prepared by Lemons from its loan files, while others examined all the loan documents in the Lemons file. Some particularly careful investors undertook their own inquiries, even going so far as to examine the underlying real property and obtaining independent appraisals. However, many others relied solely on the recommendation of the Lemons "investment counselors", and some made no selection at all, leaving the decision entirely to the discretion of Lemons. Many of this latter group understood only that their investment was secured by real estate and had no further understanding of the mechanics of a trust deed investment.

In connection with its dealings with investors, Lemons utilized several form documents. Lemons kept track of each investment by means of an internal document known as an "Investor Checklist", which was completed or amended by an investment counselor each time any action was taken with respect to an investor's investment. On the date an investor transferred

funds to Lemons, he generally received a receipt which usually specified the amount of the investment, the promised interest rate and the term (usually one year). On those occasions where an investor had selected a particular note and deed of trust, this also might be noted on the receipt. At the same time, or by mail soon thereafter, the investor often received a certificate, denominated a "Record of Investment", which contained basically the same information as the receipt. Investors were also required to execute a "Limited Collection Agent Authority", which purportedly gave Lemons the right to act as attorney-in-fact for the investor in all matters relating to collection and foreclosure of the investor's note, and a "Note and Trust Deed Repurchase Option Agreement", which purportedly gave Lemons the option to repurchase an investor's interest in a note and deed of trust. These two documents were typically effective for one year from the date of investment and, if the investor chose to "roll over" at the end of a year, he was requested to re-execute these agreements.

In Nevada, investors were also required to execute a document entitled "Lender's Waiver and Receipt of Documents". This document is permitted under Nevada Administrative Code (N.A.C.) Section 8.1, which provides that all persons dealing with licensed mortgage dealers in Nevada must be provided with certain documentation unless they waive receipt of such documents in writing.

At some point after their investment, most investors were associated with a note and deed of trust. For Nevada investors, this association was evidenced by a document entitled "Assignment of Deed of Trust." For Arizona investors, this association was evidenced by a document entitled "Assignment of Beneficial Interest Under Deed of Trust." Upon execution of one of these documents, a sale of Lemons' interest in the note and deed of trust was completed.

As the one-year anniversary date of an investor's investment approached, he was again contacted by Lemons and encouraged to "roll over" his investment for another year. If he decided to do so, he was requested again to execute a Limited Collection Agency Authority and a Repurchase Option Agreement. If he had received an assignment and he wanted to roll over into a different note and deed of trust, he was sometimes required to execute a re-assignment of his interest in the first deed of trust back to Lemons.[2] A new or revised Investor Checklist would then be created to reflect this change and the other Lemons records would be corrected.

In addition to representing to investors that they could directly purchase a note and deed of trust, Lemons told investors that it offered an Individual Retirement Account Plan. According to the Lemons IRA brochure, an investor could make qualified deposits to an IRA maintained by Lemons and those funds would be used to purchase interests in notes and deeds of trust through Lemons. As of April 10, 1985, Lemons' books and records reflected approximately $2.5 million in purported IRA investments. In fact, Lemons was never a custodian approved by the Internal Revenue Service for acceptance of IRA deposits. Lemons also represented that it maintained a money market account into which investor funds could be deposited. Investors purportedly could utilize this money market account in two ways: they could make deposits directly to that account and/or they could instruct Lemons to deposit to the account all the "interest" the investors earned on their trust deed investments. All deposits from and payments to purported money market investors were initiated and completed in the Reno Trust Account. As of April 10, 1985, Lemons held approximately $300,000.00 in purported money market investments.

### 2. *The Operation of Lemons*

Lemons actually did engage in the funding of original loans and in the secondary

---

**2.** In some cases, Lemons had the investors execute in blank a re-assignment to Lemons at the time they initially received their assignments. Lemons would then record these when an investor rolled out of a trust deed investment.

purchase of discounted promissory notes resulting from loans which had been originated by other lenders. On the date of its petition, its portfolio consisted of 646 loans and notes (of which approximately 36.7% were in default or foreclosure). The approximate total uncollected balance of these loans and notes, including both performing and non-performing loans and notes, on the bankruptcy date was in excess of $57 million. In addition, Lemons held title to numerous pieces of property ("real estate owned" or "REO") which it had earlier acquired as a result of its foreclosure of defaulted loans and notes or by outright purchase.

These loans and notes paid varying interest rates (but generally in the range of 12 to 21 percent) and had widely ranging maturity dates. The majority of the Lemons inventory consisted of interest-only loans and notes, requiring a balloon payment at maturity. In connection with its funding of loans and purchase of notes, Lemons would generate or receive various documents including, in most cases, a residential loan application, a personal financial statement of the borrower, a preliminary title report, an appraisal of the property, title and fire insurance policies, a report of the credit history of the borrower and employment and bank verifications. Upon finalizing a loan, Lemons would receive a promissory note with Lemons as the payee and a deed of trust with Lemons as the beneficiary. In the case of discount note purchases, Lemons would generally receive an endorsement of the note and an assignment of the deed of trust. With the exception of the original promissory notes held in a vault, Lemons maintained these documents in loan files in the branch office where the loan or note purchase originated. From these files, Lemons would occasionally create loan/note inventory lists which it sometimes used in connection with its sale presentation to investors. These inventory lists generally contained summary identifying information on the borrower, a description of the property securing the note and a summary of the loan terms, including the debt-equity ratio.

Whenever Lemons funded a loan or purchased a discounted note, the transaction was generally carried out through the offices of an escrow or title company.[3] Lemons would deliver to the escrow company a check drawn on one of its trust accounts. The title company would usually hold the Lemons check until all other paperwork was completed, and would then deposit the check and disburse the funds to the borrower/seller in accordance with escrow closing instructions. The promissory note would then be delivered to Lemons and the deed of trust in favor of Lemons would be recorded. Lemons continued to maintain possession of the note and usually remained the sole payee even after it had sold interests in the note to investors.[4]

Lemons generally charged points to borrowers on the loans it originated. The check which Lemons delivered to the escrow company or directly to the borrower would be for the face amount of the loan, less the amount of the points and closing costs. Following the close of escrow or delivery of the check, Lemons would routinely transfer all of the funds representing points from the particular trust account to its general operating account in Reno.

Lemons maintained numerous accounts at various banks located in Nevada and Arizona. Until late 1984, Lemons conducted most of its general business activities, such as payment of rent, utilities, etc., for all of its offices through the one general operating account controlled by the Lemons' headquarters personnel in Reno. Lemons maintained separate trust accounts for the Reno and Las Vegas branch offices and one trust account, which was jointly used by all three of the Arizona branch

---

**3.** In some cases, Lemons funded loans by delivering a trust account check directly to the borrower.

**4.** In its early years of operation, investors often appeared as the original payees of the notes in those cases where Lemons acted solely as a broker. The practice was soon changed, however, to make Lemons the sole payee.

offices. Funds deposited to the trust accounts included monies received by Lemons from investors, periodic principal and interest payments from borrowers, loan payoffs from borrowers, and fees for foreclosure costs and downpayments on properties sold by Lemons. Funds disbursed from the trust accounts included interest payments to investors, payments to investors representing payoffs of investments, payments by Lemons to borrowers funding loans originated by Lemons and payments for the purchase of promissory notes originated by other lenders or brokers. In addition, Lemons made numerous transfers of funds among the trust accounts and between the trust accounts and the general operating account.

It was a company policy, followed in all the Lemons' offices, to pay investors the agreed-upon "interest" rate from the date the investor deposited his money with Lemons. These payments were made to investors each month regardless of whether or not the investor had received an assignment in a particular deed of trust and, for those investors who had received assignments, regardless of whether or not Lemons received a payment from the borrower on the investor's deed of trust. It was this practice of guaranteed interest payments from the trust accounts rather than from company resources which necessarily eventually forced all of the trust accounts into a severe out-of-trust status.[5] This out-of-trust situation was present in the Reno and Las Vegas Trust Accounts virtually from the start of Lemons' operations. While there were numerous transfers in and out of the Arizona Trust Account, the evidence demonstrated only that that account went into a net out-of-trust status on October 12, 1983 and the situation was never remedied. In fact, Lemons' payment of guaranteed interest and its continual acceptance of new investor monies with the promise of guaranteed interest payments, both in the face of a growing lack of a performing note and loan portfolio, necessarily resulted in an ever-increasing deficit in the trust accounts.

### 3. The Fraud

Despite the fact that interest rates fell significantly during the period of 1981 to 1985, Lemons continued to advertise returns of 18 percent and more (at one point going as high as 25 percent) to investors and potential investors in the Lemons program. However, due to the falling interest rate level, Lemons was able to find fewer and fewer persons with adequate collateral who were willing or able to borrow money at 18 percent or more (and pay 10 points). The result for Lemons was a lack of loan and note inventory and an increasing number of borrower defaults.[6] Lemons continued, however, to accept investor monies even though it did not have sufficient available performing loans that it could assign to investors. The various Lemons' offices came up with different, but equally fraudulent, solutions to this common problem. In Lemons' Las Vegas and Arizona offices, when new investors could not immediately be matched with a loan, they were assigned to a list denominated the "500 account." This designation was chosen because those offices did not have an actual loan account numbered 500.[7] Designation as a 500 account investor was the functional equivalent of being "put in line" for a loan assignment as new loan inventory became available to those offices. Persons designated as 500 account investors regularly received their "interest" payments from the trust account as did those who had loan assignments.

---

5. This situation was worsened by Lemons' wrongful use of trust account monies for its own benefit, as evidenced by the substantial net transfers from the trust accounts to the general operating account and by disbursements for the benefit of J. Stephen Lemons.

6. After a borrower default, as a further result of falling interest rates and a general decline in the value of real estate, Lemons was often in the position of holding an undercollaterized note.

7. In the Reno office, to the limited extent this practice was followed, these unassigned investors were designated as the "10 account", since the Reno office already had an actual loan account numbered 500.

The Reno office had a different solution to the problem of lack of loan and note inventory. Rather than have unassigned or "10 account" investors, personnel in that office knowingly executed numerous trust deed assignments to investors in percentages greatly exceeding 100 percent. In many cases, these overassignments totaled to 400 or 500 percent and eventually the majority of loans in the Reno office were oversold in this manner. In order to conceal this situation, the Reno office developed a system for selective recordation of the trust deed assignments in an attempt to have the public records reflect no more than a 100 percent assignment.[8]

Assignment documents showing no more than a 100 percent assignment were placed in the Lemons' records in a green-labeled loan file. These assignments were generally those that were recorded, although the assignments that were recorded were not necessarily the assignments given first in chronological order. Assignment documents representing anything over 100 percent were placed in the Lemons records in a pink-labeled file, located physically adjacent to the green file. These pink-file assignments generally were not recorded. When the Nevada state auditors visited the Lemons Reno office, these pink files were concealed from them by the office management personnel.

In addition to the overassignment of loans, the Lemons offices used other devices to conceal the lack of performing loan inventory. They sold to investors interests in notes (and executed assignments of trust deeds) in cases where the note had already been paid off, where the borrower was already in default, where Lemons had already commenced foreclosure proceedings, where foreclosure proceedings had been completed and Lemons had taken title to the property, and where the note was completely fictitious. Of course, none of these practices were revealed to the investors. In fact, the investors who were victims of these practices received documentation indistinguishable from that of other investors, along with their regular monthly "interest" checks drawn on the respective trust accounts.

Lemons developed these schemes rather than face the prospect of not accepting new investor monies. Continuation of the entire Lemons operation was totally dependent upon the constant influx of new investor monies. Management personnel constantly emphasized the need to attract new investors. Lemons had insufficient loan inventory to meet its obligations to prior investors, many of the loans it did have were non-performing, and on many notes Lemons was paying out much more than it was receiving. The only source of funds from which Lemons could make up the deficiency to meet its guaranteed interest payments and pay off investor investments as they "matured", was new investor money.

The elapsed time between an investor's investment with Lemons and the completion of the sale by execution of an assignment varied widely depending upon the investor's individual circumstances (i.e., how persistent or diligent he was) and upon the Lemons' office with which he was dealing. The normal delay associated simply with the administrative processing of the paperwork was approximately thirty days. However, as the shortage of loan inventory became more acute, the time lapse between investment date and assignment date grew longer and longer, with the result that many investors waited months, even years, before they received an assignment. In addition, numerous investors, particularly those who made investments in the weeks and months immediately preceding the filing of the bankruptcy petition, never received assignments. This increasing time delay was more prevalent in the offices other than Reno. In Reno, due to the practice of routinely overassigning notes and trust deeds, there was no need to delay

---

**8.** In many cases this system broke down and more than 100 percent assignments were re-corded.

execution of the assignments beyond the normal paperwork turnaround time.

In general, Lemons conducted its operations neither in a businesslike fashion nor in substantial compliance with applicable state law and regulations. Its laxities were not designed to, and in fact did not, facilitate the secondary mortgage market. The primary purpose behind the manner in which Lemons did business was to perpetuate the fraud it was committing upon the public investors through its misuse of trust account funds. There are numerous objective indicia of the fraud committed by Lemons which permeated its dealings with investors. Lemons deposited investors' and borrowers' payments into pooled, commingled accounts which were out of trust and maintained no records of investors' interests in those accounts. Lemons paid investors interest rates in excess of the interest rates of the notes with which the investors were associated. Contrary to what it represented to investors, Lemons made the excess payments without retaining "points" in the trust accounts and without its own capital to fund this differential. Lemons paid different interest rates to investors associated with the same note or loan. The term of investments was usually one year, which bore no relation to the maturity dates of the notes and loans. In many cases, investors received monthly payments of interest even: (1) before the notes and loans with which they eventually were associated came into existence; (2) before their loans and notes began performing; (3) after their loans and notes had gone into default; (4) after the commencement of foreclosure proceedings on their loans and notes; (5) after Lemons had already taken title to the underlying real property through foreclosure proceedings; and (6) after their loans or notes had been fully paid off by borrowers or foreclosed upon by senior lienholders.

As of April 10, 1985, Lemons had total investor liabilities of $76,600,000; $45,600,- 000 were associated with then-existing loans and notes; $5,500,000 were associated with loans that had been foreclosed upon by Lemons without notice to the investors and were held as real estate owned (REO); $5,600,000 were associated with loans that had been paid off or otherwise closed (and were not REO on April 10) and the investors were neither rolled to another investment nor paid off.[9] The remaining $19,900,000 of investor liabilities included unplaced investor funds, IRA's, and money market accounts, none of which were associated with any particular asset.

As of the petition date Lemons was administering a loan portfolio of $57,100,000. Of this, $36,100,000 were performing, and $21,000,000 were non-performing, and still non-performing on September 1, 1985.

Other assets included cash on hand and on deposit of $1,000,000, REO with an estimated net value of $7,200,000, and other miscellaneous assets with an approximate value of $600,000.

The fraud of Lemons is most obviously represented by two basic factors: overassignment and unplaced investor monies. Fifteen percent, or $8,600,000, of the loan portfolio was overassigned. Investments totalling $14,500,000 were received from investors and placed into these loans making the average level of their overassignment 69 percent. As previously stated, this problem was most prevalent in the Reno office where $12,400,000 in investor monies were associated with loans having a remaining balance of $6,700,000. The facts of the Wanger test case are a good example of the practice of overassignment. In Wanger, the face amount of the note was $100,000, yet Lemons assigned investors with investments totalling $420,500 into the Wanger loan. As set forth in the separate detailed Findings, some of those assignments were recorded with the local county recorder, others were not. Predominantly a practice in the Reno office, overassign-

**9.** Although the loan no longer existed, investors continued to receive monthly interest checks identified as attributable to the original loan.

ment of loans and notes was found in all offices.

In offices where overassignment was less prevalent, much of the Lemons fraud was manifested by unplaced investor funds. Of the $19,900,000 in investments not associated with any particular asset, $17,000,000 were accounted for by Lemons in the "500" and "10" accounts as unplaced investments. Unplaced investments were especially common in the Arizona and Las Vegas offices where they approximated $16,200,000. An additional $2,500,000 were associated with loans administered by those offices that were closed before the bankruptcy date where the investors were not rolled to another investment, or not paid off, or where their investments were not represented by REO. That is not to say that on the petition date there was $18,700,000 in the two trust accounts. On the contrary, the total balance in all of the Lemons trust accounts as of April 10, 1985 was only $900,000.

An analysis of the Arizona trust account, in terms of the use of new money obtained from investors, is useful in explaining the shortfall in the trust accounts. Between January 1, 1985 and April 10, 1985, the Arizona offices took in $8,635,000 in new investor monies. Although new investor funds should have been used solely for the purpose of funding loans to borrowers or for the purchase of discounted notes, only 72.7 percent, or $6,280,000, were used for these purposes. Approximately $2,355,000 of the new investor monies received during this time period were used for improper

purposes, primarily interest payments and payoffs to other investors. During that same time period, Arizona investors received a total of $3,483,000, of which $1,838,000 represented payoffs and $1,645,000 represented interest on their investments. This money should, theoretically, have come only from corresponding loan payments and/or interest payments made by borrowers. The total loan payoffs by borrowers for this same period were $1,561,000, and regular monthly payments by borrowers were $863,000, providing payments by borrowers of only $2,424,000, or a shortfall of $1,059,000 for just one office for approximately a three month period.[10] This shortfall could only be covered by using new investor money to pay old investors;[11] a typical "Ponzi" scheme. *See Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (case involving Charles Ponzi).

## CONCLUSIONS OF LAW AND DISCUSSION

### 1. *Jurisdiction and Venue*

The Court has jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334 and 157, and Special Order No. 50 (Local Rule 900) of the United States District Court for the District of Nevada. Venue in the District of Nevada is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### 2. *Entitlement to the Promissory Notes*

■ Property of the estate includes all legal or equitable interests of the debtor as

---

**10.** This information is more easily understood when presented in tabular form.

Arizona Trust Account
Payments from Borrowers vs. Payments to Investors
January 1 through April 10, 1985

Payments from Borrows:
| | |
|---|---|
| Monthly Payments | $ 863,425.64 |
| Payoffs | 1,560,657.45 |
| | $2,424,083.09 |

Payments to Investors:
| | |
|---|---|
| Interst | $1,645,128.20 |
| Payoffs | 1,838,170.54 |
| | $3,483,298.74 |

New Money Used to Pay Old Investors   $1,059,215.65

**11.** The extent of the fraud may be further illustrated by comparing monthly revenue to monthly disbursements. On April 10, 1985 loans with a current balance of $36,100,000 were performing. Assuming an average interest rate of 18%, these loans would have generated $541,500 in monthly interest payments from borrowers. On the other hand, investor liabilities totalled $76,600,000. Assuming an 18% yield on investments, Lemons paid out approximately $1,149,000 in interest payments to investors. The result was a monthly shortfall of $607,500 at the time of the bankruptcy.

of the commencement of the case. 11 U.S.C. § 541(a)(1). Section 541(a)(1) of the Bankruptcy Code ("the Code"), however, does not vest the estate with any greater property rights than those held by the debtor at the commencement of the case. Thus, if the debtor holds only bare legal title to property, then only bare legal title vests in the bankruptcy estate.

The named investors (and the Beneficiary Committee) argue that they are not "creditors" of the estate, but owners of interests in the promissory notes assigned to them which Lemons allegedly holds in trust for their benefit. They rely on 11 U.S.C. § 541(d) which provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

The trustee (and the Unsecured Creditors Committee) challenge the application of § 541(d) based on four principal contentions: (1) that Lemons and its investors were not participants in the type of "secondary mortgage market" that § 541(d) was enacted to protect; (2) that the transactions between Lemons and the claimants to the notes were unsecured loans rather than sales; (3) that Lemons' pre-bankruptcy misconduct or fraud precludes the application of § 541(d); and (4) that even if the interests at issue are excluded from the estate by § 541(d), they are brought back into the estate by use of the trustee's avoiding powers.

### a. *Application of Section 541(d)*

■ The legislative history of § 541(d) is replete with references to "the secondary mortgage market" and "bona fide second-ary mortgage market transactions". See *e.g.*, S.Rep. No. 95–989, 95th Cong., 2nd Sess. 83 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5869:

> Section 541(e) [now (d)] confirms the current status ... of bona fide secondary mortgage market transactions as the purchase and sale of assets. Mortgages or interests in mortgages sold in the secondary mortgage market should not be considered as part of the debtor's estate.

*See also In re Mortgage Funding, Inc.*, 48 B.R. 152, 155 (Bankr.D.Nev.1985); *In re Columbia Pacific Mortgage, Inc.*, 20 B.R. 259, 261–62 (W.D.Wash.1981); *In re Adana Mortgage Bankers, Inc.*, 12 B.R. 989, 1005–08 (Bankr.N.D.Ga.1980). It is indisputable that the major motivating force behind the enactment of § 541(d) was the protection of the national secondary mortgage market, and certain participants in that market, such as Federal Home Loan Mortgage Corporation, the Government National Mortgage Association and the Federal National Mortgage Association. *See In re Adana Mortgage Bankers*, 12 B.R. at 1006–07; *Senate Hearings on S. 2266 and H.R. 8200* at 1131–62 (Letter and accompanying memorandum dated January 24, 1978 from the Federal Home Loan Mortgage Corporation to the Senate Judiciary Committee.) The trustee contends that the Court should limit the application of § 541(d) to transactions where the buyer is in the business of purchasing mortgages or deeds of trust, and the debtor engages in a national rather than a metropolitan market, and sells interests in first mortgages (which it originated), rather than second or third mortgages. *See In re S.O. A.W. Enterprises, Inc.*, 32 B.R. 279, 283 (Bankr.W.D.Tex.1983); *In re Investment Sales Inc.*, 38 B.R. 446, 449 (Bankr.D.Minn. 1984). This Court finds no justification for such a constrained interpretation.

An examination of § 541(d) reveals that it simply restates and clarifies what is already the law under § 541(a)(1), namely, that property of the estate includes only those legal and equitable interests held by

the debtor at the commencement of the case. *See In re Executive Growth Investments, Inc.,* 40 B.R. 417, 423 (Bankr.C.D. Cal.1984). The split of legal and equitable interests referenced in § 541(d) is a fundamental characteristic of a trust. The trustee has bare legal title and the beneficiary has the equitable interest. *O'Steen v. Estate of Wineberg,* 30 Wash.App. 923, 640 P.2d 28, 34 (1982). To the extent that § 541(d) exempts trust property from the estate, the enactment of that section did not change prior law. It was well settled under the former Bankruptcy Act that the bankruptcy trustee succeeds to only the title and rights in property that the debtor had previously possessed. Where the debtor had been in possession of trust property, the bankruptcy trustee holds such property subject to the outstanding interests of the beneficiaries. *See American Service Co. v. Henderson,* 120 F.2d 525, 530 (4th Cir. 1941); 4A Collier on Bankruptcy ¶ 70.25 (14th ed.) (discussing § 70(a)(5) of the former Act). Section 541(d) simply makes this principle explicit. It recognizes and exempts from the estate all property held in trust by the debtor, and is not limited to the protection of particular equitable interests such as those at issue here. *See Columbia Pacific Mortgage,* 20 B.R. at 262. It is certainly not limited to an institutional, national market in first trust deeds as urged by the trustee in this case.

### b. *Sale vs. Loan Transactions*

The relationship between trust concepts and the sale of interests in notes or mortgages is this: Where the mortgagee sells his interest to another but retains legal title in order to service the note, the seller holds the note and its proceeds in trust for the purchaser. As one commentator noted, the express trust is the most pervasive concept supporting loan and mortgage participations as property interests to be excluded from the bankruptcy estate. Mac-Donald, *Loan Participations as Enforceable Property Rights in Bankruptcy—A Reply to the Trustee's Attack,* 53 Am. Bankr.L.J. 35, 54 (1979). Of course, the claimant has the burden of establishing the

trust relationship; he must prove his title and identify the trust res. *American Service v. Henderson,* 120 F.2d at 531. The trust res may be a fractional or undivided interest without violating the requirement that the subject matter of the trust be definite. *Estate of Berryman, United Presbyterian Foundation v. Berryman,* 595 P.2d 1120, 1127 (Kan.1979).

The trustee argues that the investors made loans to Lemons secured by interests in the promissory notes rather than purchases of interests in the notes themselves. Characterization of these transactions as loans rather than purchases would have at least two significant consequences. First, since none of the investors were in possession of the promissory notes involved herein, their security interests would not be perfected under state law, and therefore, the investors would be unsecured creditors of the estate only. *See In re Staff Mortgage & Investment Corp.,* 625 F.2d 281 (9th Cir.1980). Second, if no sales occurred, the investors could not claim an equitable ownership interest in the notes under Section 541(d). Compare *In re Mortgage Funding, Inc.,* 48 B.R. 152 (Bankr.D.Nev.1985) with *In re Fidelity Standard Mortgage Corp.,* 36 B.R. 496 (Bankr.S.D.Fla.1983). Based on the documentary evidence presented, however, the court finds that the transactions should be characterized as sales of interests in the notes, rather than loans by investors secured by interests in the notes.

Most of the investors herein obtained from Lemons an "Assignment of Deed of Trust" or "Assignment of Beneficial Interest in Deed of Trust" purporting to convey a fractionalized interest in a particular deed of trust in real property that secures repayment of a promissory note. The advertising brochures supplied by Lemons described the transactions in terms of a "purchase" by investors and a "sale" by Lemons. Additionally, the brochures speak of "reselling" interests in the notes and deeds of trust and in terms of investments and risks. Absent a sale by Lemons of its interest in the notes, the "Note and Deed

of Trust Repurchase Option Agreement" and "Limited Collection Agent Authority" typically required to be executed by investors simply would have been unnecessary.

These objective manifestations of the parties' intent to consummate a sale transaction rather than a loan, together with the named investors' testimony to the same effect, are not outweighed by other evidence, such as the "Lender's Waiver and Receipt of Documents" that Lemons required the Nevada investors to execute. The Court acknowledges that Lemons' practice of "guaranteeing" regular returns to investors irrespective of the actual performance on the notes, and, at return rates exceeding the interest rates paid by the borrowers, does indicate that the investors bore none of the risks normally accompanying a purchase. Similarly, the "Early Withdrawal" provisions that allowed investors to disassociate themselves with notes suggests that the risk associated with an investment purchase was lacking. On balance, however, the Court finds that these inconsistencies are insufficient to outweigh the objective indications of an intended sale manifested by the other documents.

Since the court is characterizing the transactions between Lemons and its investors as sales of interests in the mortgage notes rather than loans by the investors, the *Staff Mortgage* analysis is not controlling. Absent special circumstances, the application of § 541(d) would now be relatively straightforward. The Court would follow its previous decision in *Mortgage Funding, supra,* and declare the investors to have the beneficial ownership of the disputed notes upon a showing that:

(1) the debtor and the investor agreed that the investor would be sold or assigned a specific note or fractional interest in a particular note;

(2) the debtor has assented to this in writing;

(3) the investor has paid the debtor in full for the interest;

(4) the assigned or sold note exists and has not been repaid or foreclosed.

48 B.R. at 155. However, special circumstances exist in this case that were not present in *Mortgage Funding.*

c. *The Effect of Lemons' Fraud*

Rather than the relatively simple case where a mortgage seller has become insolvent and a buyer's purchase of a mortgage note is reflected by the seller's accounting, here the evidence reflects a diverse but purposeful fraud upon all of Lemons' investors. The evidence indicates and the Court has found that from the first day of its operations in Nevada, Lemons' trust accounts were substantially out of trust. Lemons did not maintain a trust accounting of funds received from or for investors, nor of funds disbursed to or on behalf of investors. Lemons commingled its trust accounts, without any accounting of its liability to investors, and used the funds for any purpose necessary to continue operations. In part, this out-of-trust situation was caused by Lemons' practice of making interest and withdrawal payments to investors irrespective of borrowers' performance on the notes with which the investors were associated. Lemons' fraud upon its investors was manifested in several ways, including overassignment of the notes. As clearly demonstrated by the Wanger loan, Lemons' overassignment practice was the result of a conscious decision to mislead investors by assigning interests that Lemons did not even own. Similarly, the use of separate, color coded files to shield the overassignments and other improper practices from the scrutiny of state investigators further illustrates Lemons' intentional deception of all of its investors.

The Court similarly has found that Lemons was out-of-trust in its Arizona accounts from at least October 12, 1983. As in Nevada, Lemons followed its program of guaranteeing payments to investors irrespective of the existence or performance of the related notes. As guaranteed payments from the trust accounts, note defaults, and investor commitments increased, so did the severity of Lemons' out-of-trust status in Arizona. Lemons nevertheless continued to offer high yield

investments in mortgage notes, and continued to accept investors' monies and use those monies for other purposes even though there were no notes available for assignment. Rather than overassigning existing notes as was the practice in Nevada, Lemons' Arizona practice was to simply accept the funds and make "interest" payments to the investors even though the investments were not associated with a note. Only after a note came into existence, if ever, was an assignment made. Moreover, the assignment may have been made many months after an investor placed his or her funds with a Lemons Arizona branch office. Thus, a large number of investors in Arizona received no assignments at all and their investment funds were "unplaced" on the date Lemons filed its bankruptcy petition. In fact, most of their money had already been disbursed to themselves and to other investors in payments of interest and withdrawals.

Due to the absence of any accounting for trust account liabilities to investors and the other significant fraud in the trust account, both in Nevada and Arizona, funds placed with Lemons by its investors ceased being identifiable to a particular investor or to a particular promissory note immediately upon deposit with Lemons. Rather, investors' monies and borrowers' payments were indiscriminately commingled by Lemons and used to fund loans, purchase discounted notes, pay interest payments and investment withdrawals to other investors, and pay general operating expenses. The severity of the commingling increased as Lemons' commitments to investors outran the funds available from its trust accounts. Since Lemons continued to try to meet its commitments in spite of its financial condition, it increasingly relied on new investor monies to meet its obligations to old investors. Thus, the assignment of an interest in a particular note by Lemons generally bore no relationship to a loan made or acquired by Lemons with an investor's funds. Instead, the assignments were necessary tools of Lemons' fraudulent scheme and seldom, if ever, could be linked to the funds of a particular investor.

In determining the application of § 541(d), the Court may assess the debtor's operations described above under the standard suggested by *Fidelity Mortgage:* to what extent was the sloppiness of the debtors' operations intentional in order to facilitate its secondary mortgage market business, which is to be protected by Congress, rather than due to bad business practices or outright fraud. The *Fidelity Mortgage* court concluded:

Where the debtors' business was mortgage brokering, and where, as here, the divergence in the method of operation from the strict requirements of state law served to facilitate the transfer and servicing of mortgages, there is a presumption that transactions were handled in that manner for that purpose. Although there were slight suggestions of fraud and ignorance of the mortgage business or of good business practice generally, there was insufficient evidence that any of these was the reason for the debtors' failure to execute or record assignments of mortgages. Therefore the presumption stands and the debtors' operations generally will be deemed to be sanctioned by § 541(d).

36 B.R. at 500.

In the matter before the Court, there is more than "slight suggestions" of fraud and ignorance of good business practice. Rather, there is very clear evidence of pervasive fraud and extremely poor business practice intentionally used to facilitate the fraud; i.e., the debtors' failure to endorse and surrender the notes or record all assignments was intended to facilitate the fraud as opposed to the free transfer of mortgages in the secondary mortgage market. Accordingly, the debtors' operations generally will not be deemed to be sanctioned by § 541(d).

The trustee has further argued and the Court agrees that the interests which Lemons purported to assign to selected investors were already encumbered with the equitable claims of other investors. The commingling of funds in violation of Lemons'

fiduciary duty, together with the outright fraud and misrepresentation, constitutes the predicate for the equitable claims of all the investors. Therefore, both "placed" and "unplaced" investors have competing and overlapping equitable claims to the notes.

■ Lemons owed a statutory fiduciary obligation to all of its "purchaser investors" in handling both the funds invested and the payment collected from borrowers—the proceeds of the notes Lemons purportedly held in trust. *See e.g.*, Nev.Rev. Stat. § 645B.175. Moreover, investors deposited money with Lemons for a particular purpose: for purchase of a note or part interest in a note. Lemons failed to reveal to its investors that its shortage of performing notes would require placement in an "unassigned" account, or assignment of an oversold or nonperforming note. Since Lemons required a continual influx of new investor money to keep operating, it misrepresented its operations in order to lure more investors.

■ The investors' equitable claim is a claim of trust on the funds deposited in the Lemons trust account. As noted above, the trust may arise by statute, through the express intent of the investors and Lemons, or by implication from a consideration of the facts and circumstances surrounding the investment. *See generally Eckart v. Hubbard*, 184 Mont. 320, 602 P.2d 988 (1979). *See also Doss v. Kalas*, 94 Ariz. 247, 383 P.2d 169, 173 (1963) (express trust); *Cacy v. Cacy*, 619 P.2d 200, 202 (Okla.1980) (resulting trust). The defrauded investors have, at a minimum, a constructive trust claim due to the misrepresentations and general unconscionable conduct through which their investments were obtained. Both Arizona and Nevada would impose a constructive trust whenever title to property has been obtained by fraud, misrepresentation, or other circumstances which render it inequitable for the holder of legal title to retain and enjoy the beneficial interest. *See In re Estate of Rose*, 108 Ariz. 101, 493 P.2d 112, 115 (1972); *Schmidt v. Merryweather*, 82 Nev. 372, 418 P.2d 991 (1966). Generally, the doctrine of constructive trust is a flexible, equitable remedy used to prevent unjust enrichment. See *Namow Corp. v. Egger*, 99 Nev. 590, 668 P.2d 265 (1983); *L.M. White Contracting Co. v. Tucson Rock & Sand Co.*, 11 Ariz.App. 540, 466 P.2d 413 (1970). Furthermore, a constructive trust reverts back in time; it is declaratory of the rights of the injured party at the time of the transaction at issue. *King v. Uhlmann*, 103 Ariz. 136, 437 P.2d 928, 941 (1968).

■ The beneficiary of a trust of any kind may claim any property acquired with the trust res. "No change of form can divest a trust fund of its trust character...." *Republic Supply Co. of California v. Richfield Oil Co.*, 79 F.2d 375, 377 (9th Cir.1935). See also *Namow Corp.*, 668 P.2d at 267; *Kline v. Orebaugh*, 214 Kan. 207, 519 P.2d 691, 695 (1974). The beneficiary may share *proportionately* in any property obtained with his funds to the extent of his contribution. *G & M Motor Co. v. Thompson*, 567 P.2d 80, 83–84 (Okla. 1977). Finally, the beneficiary may trace his interest in the hands of a third-party transferee; his equitable rights may be cut off only by conveyance to a bona fide purchaser who pays value without notice of the prior equitable claim. See Restatement (Second) of Trusts § 284; *Kline v. Overbaugh*, 519 P.2d at 696; *Huber v. Coast Investment Co., Inc.*, 30 Wash.App. 804, 638 P.2d 609, 612 (1981).

In addition to the above trust principles, the Court notes that equal pro rata distribution among similarly situated creditors is one of the strongest policies behind the bankruptcy laws. *Torres v. Eastlick (In re North American Coin & Currency, Ltd.)*, 767 F.2d 1573, 1575 (9th Cir.1985). The trustee here has convinced the Court that for the most part, all investors are similarly situated from an equitable point of view. They all intended to purchase an interest. Many received a "good" assignment while many others did not. These others received an assignment to an oversold or nonperforming note, or were left "un-

placed". To some extent this was completely fortuitous, depending upon luck and timing. In other cases, the diligence and sophistication of the investor played a part.

The "placed" investors who claim an entitlement to the interests assigned to them argue that they do have a special status, that of "bona fide purchasers" whose interests are free of other equitable claims of which they had no notice. They further contend, therefore, that the fraud in Lemons' internal procedures cannot affect their rights under § 541(d). However, in order to obtain BFP status one must acquire *legal* title. *See Huber v. Coast Investment Co., Inc.,* 638 P.2d at 612–13; Restatement (Second) of Trusts § 286 (where a trustee in breach of trust merely purports to create an equitable interest in a third party, that party cannot enforce his interest although he paid value and was without notice of the prior equitable claim). Accordingly, the Court should not aid these particular investors in gaining an advantage over others where these claimants did not achieve BFP status. Although this puts the burden of unknown fraud on technically innocent parties, it accords with general trust principles. A different result here would allow one investor to benefit from the fraud practiced on others. This equity cannot sustain.

From the foregoing the Court concludes that the notes assigned to particular investors are subject to the competing equitable claims of others. The question remains, however, what should be the final resolution of these claims. The trustee has proved that the investments generally were deposited in the commingled accounts and all notes and loans were purchased or funded out of these accounts. Since no investor can actually trace his funds to a particular note, all investors, the trustee argues, have a claim to a pro rata share of the pool of notes. This result would be consistent with the above-noted bankruptcy policy in favor of equal distribution to similarly situated parties. Because of this policy, bankruptcy courts impose strict requirements on those who wish to take trust property out of the estate. These requirements often go beyond what state law might dictate as sufficient to impose a trust. *See Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *Torres v. Eastlick,* 767 F.2d 1573; *Elliott v. Bumb,* 356 F.2d 749, 754 (9th Cir.), *cert. denied,* 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966).

■ A party who wishes to exempt trust property from the estate must not only prove the existence of the trust relationship, but must also specifically identify the trust property in either its original or substituted form. *See Elliott v. Bumb,* 356 F.2d at 754–55; *American Service Co. v. Henderson,* 120 F.2d at 530–31. Due to the commingling and fraud in the Lemons trust accounts, no investor can trace his investment to any specific note or other asset of the estate. This is the rule of *Cunningham v. Brown,* applied recently in *Merrill v. Abbott (In re Independent Clearing House),* 41 B.R. 985, 1001–02 (Bankr.D.Utah) ("ICH") and this Court's *Henderson v. Allred (In re Western World Funding),* 54 B.R. 470, 475–76 (Bankr.D. Nev.1985).

■ *Cunningham, ICH* and *Allred* were preference actions in which the preferred creditors attempted to make what is in essence a § 541(d) argument. The first element of a voidable preference is that there be a transfer of property of the debtor. *Allred,* 54 B.R. at 475; 11 U.S.C. § 547(b). In the above cases, the creditors argued that what they had received prepetition was not the debtor's property at all, but simply a return of their own fraudulently-obtained funds; i.e., funds held in a constructive trust for them. As applied to the matter *sub judice, Cunningham* and its progeny stand for the proposition that, even assuming the existence of a trust relationship, a creditor cannot sufficiently identify or trace the trust res through a commingled fund where the fund is too small to satisfy the claims of similarly situated parties. To do so would allow that claimant to benefit at the expense of those who have equally strong equitable claims

to the same fund. Thus, the *Cunningham* line of cases rejects the fictional tracing rule which allows a claimant to trace the trust res through a commingled account. Instead, pro rata distribution will be the rule when necessary to achieve an equitable result. In this circumstance, "Equality is equity".[12]

### d. *The Trustee's Avoiding Powers*

The parties have advanced other arguments regarding the applicability of the trustee's avoiding powers and 11 U.S.C. § 365. First, the trustee points out that "property of the estate" includes not only the legal and equitable interests held by the debtor as of the commencement of the case, but also any interest in property that the trustee recovers under other sections of the Code, such as the provisions for avoiding certain transfers. *See* 11 U.S.C. § 541(a)(3); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983). Thus, the trustee contends, § 541(d) does not preclude the use of § 544 (the "strong-arm clause"), § 547 (avoidance of preferential transfers), and § 548 (avoidance of fraudulent transfers). The Court disagrees as to the availability of § 544 only.

Section 544(a) gives the trustee certain statuses that enable him to avoid or eliminate invalid or secret liens and transfers. *See* 4 *Collier on Bankruptcy* ¶ 544.-02 (15th ed. 1985). The trustee may avoid any transfer of an interest in property that is voidable under applicable state law by a judicial lien creditor, unsatisfied execution creditor, or bona fide purchaser of real property. Thus, interests which are "unperfected" under state law are subject to attack. However, the legislative history of § 541(d) is quite clear that Congress intended to exempt secondary mortgage market participants from compliance with state laws regarding "perfection" of the interests of the purchasers:

> The seller of mortgages in the secondary mortgage market will often retain the original mortgage notes and related documents and the seller will not endorse the notes to reflect the sale to the purchaser. Similarly, the purchaser will often not record the purchaser's ownership of the mortgages or interests in mortgages under state recording statutes. These facts are irrelevant and the seller's

---

**12.** At the conclusion of trial, the Court announced a preliminary decision together with findings of fact as set forth above. In addition, however, the Court announced its own fictional tracing rule in order to allow diligent investors to identify and claim certain trust deed investments closely associated in time (a maximum of thirty days) to their date of deposit with Lemons. As stated on the record, the purpose of the rule was to recognize the legal and economic expectations of diligent investors who had investigated and insisted upon immediate assignment and documentation of a particular trust deed. Upon careful review of the record, I can no longer support that rule as an equitable remedy in this case.

In devising the fictional tracing rule, I had assumed that it would apply to a relatively small number of investors and would not substantially deplete the estate's assets, thereby preserving the overall equality of distribution. In final draft, however, the rule would have carved out a substantial number of investors and a large share of the trust deed notes involved in the test cases. More disheartening, the proposed rule would have separated successful and unsuccessful claimants to notes on a purely fortuitous basis—time—as opposed to the actual diligence

or personal involvement and investigation by the various investors.

Moreover, in actual application, the fictional tracing rule would protect claimants to notes and trust deeds which were the subject of the greater intentional fraud. In the Arizona offices, Lemons did not engage in overassigning notes but simply left the investors in an "unplaced" status for a lengthy period until a trust deed investment could be found. Accordingly, a relatively small number of Arizona investors could claim the rule as a defense. In the Reno office, on the other hand, a significant number of notes were overassigned as part of the intentional and fraudulent scheme of Lemons. Thus, a larger proportion of the Reno investors would have qualified for the protection of the tracing rule because of the immediate but fraudulent placement of all investors in that office. In other words, the rule in practice tended to discriminate between "placed" investors on the basis of the method of fraudulent operation in the different Lemons offices, as opposed to the actual diligence of the investor.

The Court therefore rejects the previously announced fictional tracing rule and adopts full equality as the greater equity in this case.

retention of the mortgage documents and the purchaser's decision not to record do not change the trustee's obligation to turn the mortgage or interests in mortgages over to the purchaser. 124 Cong.Rec. S.17, 413 (Oct. 16, 1978). Thus, the trustee cannot use § 544(a) against the assignees of interests in mortgages. To allow otherwise would completely frustrate the protection Congress intended to give to the secondary mortgage market. *See Columbia Pacific Mortgage,* 20 B.R. 259; *Fidelity Standard Mortgage,* 36 B.R. 496.

■ However, nothing in § 541(d) or its legislative history indicates that the trustee is precluded from attacking the assignment of an interest in a mortgage, or the creation of any trust generally, as preferential under § 547 or fraudulent under § 548. Just as the grant of a security interest within the preference period may be avoided under § 547, *see In re Fitzgerald,* 49 B.R. 62 (Bankr.Mass.1985), the creation of a trust may effect a preference subject to attack. *See North American Coin,* 767 F.2d at 1576 n. 2. It is also easy to imagine that the circumstances surrounding the creation of a trust may meet the requirements of a voidable fraudulent conveyance. The trustee may pursue these actions where appropriate. The Court does not now decide anything regarding the merits of any such action or the availability of defenses or exceptions.

e. *Application of Section 365(i) and (j)*

■ The named investors and Beneficiary Committee raise the issue whether the investors might qualify for secured creditor status under 11 U.S.C. § 365(i) or (j). If the trustee rejects an executory contract of the debtor for the sale of real property or a timeshare interest in real property, subsection (i) allows a purchaser in possession to elect either to remain in possession and eventually obtain the title, or to treat the contract as terminated. Subsection (j) further provides:

A purchaser that treats an executory contract as terminated under subsection (i) of this section, or a party whose executory contract to purchase real property from the debtor is rejected and under such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid.

The investors cannot be said to be "in possession of" real property or a timeshare interest under subsection (i). The argument for the applicability of subsection (j) rests on the contention that since a deed of trust is an interest in real property under Nevada and Arizona law, an assignment of a trust deed is a sale of an interest in real property within the purview of § 365(j). Further, the investor agreements with Lemons must be executory because Lemons had a continuing obligation to make payments to the investors and the investors remained obligated to reconvey title. The Court disagrees.

Section 365(j) is not so broad as to encompass agreements for sale of any type of interest in or related to real property. The contract must be for the sale of the real property itself or a timeshare interest. Secured status under this section was intended to protect only "bona fide vendees of *ownership interests* in real property," rather than the interests of those who hold legal title for security purposes. *In re Nite Lite Inns,* 13 B.R. 900, 910 (Bankr.S.D.Cal.1981). *See also In re Adolphsen,* 38 B.R. 780, 781 (D.Minn.1983) *aff'g* 38 B.R. 776 (Bankr.D.Minn.1983) (a contract for deed is not a contract for the sale of real property, but is merely a financing arrangement for a sale that has already occurred). The protection for timeshare purchasers was added in 1984, and is consistent with this limited construction of "sale of real property". A timeshare interest, defined in 11 U.S.C. § 101(47), gives the purchaser the right to use and occupy accommodations, facilities, or recreational sites for a specific period of time less than one full year. It is simply a form of joint or shared ownership of the real property itself. This addition provides no justifica-

tion for expanding the scope of § 365(j) to include all interests somehow related to real property.

Although a deed of trust is an interest in real property for some purposes, it is actually a device used to secure payment due under a promissory note, which is personalty. In order to claim the benefit of the security, a party must first establish his interest in the note itself. While transfer of an interest in the note conveys the benefit of the security as a matter of law, the deed of trust alone is of no value without the note it secures. *See Columbia Pacific Mortgage,* 20 B.R. at 263; *In re Kennedy Mortgage Co.,* 17 B.R. 957, 965 (Bankr.D. N.J.1982); *Hill v. Favour,* 52 Ariz. 561, 84 P.2d 575, 578 (1938); *Giorgi v. Pioneer Title Insurance Co.,* 85 Nev. 319, 454 P.2d 104 (1969). *See also* Kransnowiecki, Miller & Ziff, *The Kennedy Mortgage Co. Bankruptcy Case: New Light Shed on the Position of Mortgage Warehousing Banks,* 56 Am.Bankr.L.J. 325, 333 (1982) (hereinafter cited as *New Light*). Since "the debt is the principal thing," with the security merely an accessory, *New Light, supra* at 333, any investor who wishes to claim an interest in the underlying real property as security must first establish his interest in the note under § 541(d) as outlined above.

■ Furthermore, the agreements between Lemons and the investors are not executory contracts under § 365. Although Congress did not define the term "executory contract", the Ninth Circuit has held that for § 365 purposes, a contract is executory where the obligations of both parties are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other. *In re Pacific Express, Inc.,* 780 F.2d 1482, 1487 (9th Cir.1986). Here, no substantial performance remains on the part of the typical investor. He has paid his money to Lemons, and there is little or nothing left for him to do except await repayment. An obligation to convey title or to surrender a promissory note upon satisfaction of the underlying debt is insufficient to render an agreement executory. *See, e.g., Horton v. Rehbein (In re Rehbein),* 60 B.R. 436, 440–41 (Bankr. 9th Cir.1986); *In re Rojas,* 10 B.R. 353, 355 (Bankr. 9th Cir.1981); *In re Adolphsen,* 38 B.R. at 778.

## CONCLUSION

Applying the above discussion to the particular investors involved in these adversary proceedings, the court reaches the following conclusions:

1. The Gott note (*Hatoff et. al. v. Lemons*).

2. The Wanger note (*Bergstrom et al v. Boone et al.*).

3. The Lewis note (*Bergstrom v. Gauert et al*). In each of the above cases, the trustee continues to hold promissory notes made payable or endorsed to Lemons. While beneficial interest in the notes and trust deeds were assigned to the various investors, the notes and trust deeds are subject to the competing and equal equitable claims of all other defrauded investors. Thus, the assignee investors may not avail themselves of § 541(d) in demanding turnover of the respective notes. Rather, the Court will give judgement that the legal and equitable ownership of the notes and related trust deeds will remain with the trustee for liquidation and prorata distribution to all investors.

■ 4. The McMahan note (*Haydis et al v. Lemons*). The Haydises obtained assignment of the McMahan note through rollovers of earlier investments plus their deposit of additional sums in November 1983. They received 21 percent interest, two points over the 19 percent McMahan paid to Lemons. After McManan's default, the foreclosure on the deed of trust left title to the real property in the Haydises' names. Because of this, they do not need to rely on § 541(d) to establish their interest. They have actual legal title, not merely an equitable claim. The trustee is obligated to release the property to the Haydises, unless the trustee can successfully void their title under some other theory.

The Court previously bifurcated trial on any remaining issues under 11 U.S.C. §§ 547, 548 and 549. Within thirty days after entry of judgment, the trustee shall obtain further trial date on these issues or abandon and release any claims to the property.

The Haydises did not learn of the McMahan default, or that title was in their names, until after the bankruptcy was filed. They continued to receive monthly interest checks from Lemons after the default and the foreclosure sale. As a condition of claiming the real property, the Haydises must return to the trustee all payments received after McMahan's default, as well as the excess interest. Although Lemons represented that it would pay the Haydises this extra interest by sharing the points it received, the $33,000.00 in points went into the commingled trust accounts and cannot be traced to the extra 2 percentage points of interest paid to the Haydises every month. In total, Kenneth Haydis received and must return excess payments of $32,890.39, and Austen Haydis $21,673.49.

Judgment shall be entered accordingly.